THE SUNOIL.

THE EAGLE.

SUN OIL CO. v. STANDARD VACUUM TRANSP. CO.

STANDARD VACUUM TRANSP. CO. v. SUN OIL CO.

Nos. 12900, 13070.

District Court, E. D. New York.

Aug. 23, 1934.

Duncan & Mount, of New York City (Henry W. Dieck, Jr., of New York City, of counsel), for Sun Oil Co.

Macklin, Brown, Lenahan & Speer, of New York City (Paul Speer, of New York City, of counsel), for Standard Vacuum Transp. Co.

CAMPBELL, District Judge.

The above-entitled actions were brought to recover for damages alleged to have been caused by collision.

The suits arose out of the same collision, were tried together, and, the facts being the same in both cases, but one opinion will be required.

I find the facts as follows:

At all the times hereinafter mentioned and at the time of the trial the libelant Sun Oil Company was a corporation of the state of New Jersey, and the owner of the motor vessel Sunoil.

At all the times hereinafter mentioned, prior to the happening hereinafter referred to, the motor vessel Sunoil was tight, strong, staunch, and in all respects seaworthy and properly manned and equipped.

At all the times hereinafter mentioned, and at the time of the trial, the cross-libelant Standard Vacuum Transportation Company was a corporation of the state of Delaware and the owner of the steamship Eagle, which up to the time of the happening hereinafter mentioned was tight, staunch, strong, and in all respects seaworthy and properly manned and equipped.

The motor vessel Sunoil and the steamship Eagle were, during the currency of process hereunder, within this district and within the jurisdiction of this court.

The jurisdiction of this court is admitted.

On the morning of January 9, 1931, the motor vessel Sunoil, owned by the libelant and cross-claimant, was proceeding up the Sabine-Neches Canal light, in ballast, inward bound.

The Sunoil was in charge of a pilot, Petersen, who came on board at Sabine Bar. She was 480.6 feet long, 66 feet beam, 36.8 in depth, gross tonnage 8,946, net tonnage 5,429, and was drawing 3 feet forward and 18 feet aft.

The Sunoil was proceeding up the canal bound for Port Sun, which is midway between Port Arthur and Beaumont, about 18 miles above Port Arthur. When she was above Texas Island in a straight reach in the canal below Port Arthur, she observed two vessels above Port Arthur bridge coming down outward bound; the first vessel being the steamship Tustem, and the second the steamship Eagle.

The steamship Eagle was loaded, and was drawing 29 feet 4 inches.

The tide was ebb, that is, running out, the wind between northeast and northeast by north, force 3 on the Beaufort scale, weather clear, and visibility good.

The motor vessel Sunoil, at 9:45 a. m., dropped her starboard anchor with 15 fathoms of chain in the water, with the brake on. This was the customary practice in going up the canal on that reach. At that time she was above the first bend above Texas Island, and dropped her anchor to hold the ship's head up to the wind, and to her right side of the canal. As the Tustem approached, one whistle signals for a port to port passing were exchanged, and at about 10 a. m. the steamship Tustem passed the Sunoil safely, with sufficient clearance. Vessels that do not sheer pass safely in that straight reach.

About 20 minutes later, the steamship Eagle came down, with the tug Chief forward of her on her starboard side of the canal, and having a 400-foot hawser on the steamship Eagle, with the purpose of keeping her on her starboard side of the canal.

The Sunoil, with the pilot, master, and third officer on the bridge, with a quartermaster at the wheel, and the chief officer and another man on the forecastle head, was proceeding bucking the tide at dead slow speed, with her starboard anchor dragging on a 15-fathom hawser, and so holding her head up to the bank on her starboard side of the canal, with her stern out about 10 or 15 feet. From time to time the Sunoil was put ahead at slow speed for short intervals, to hold her head up against the bank on her starboard side.

There is a passing place in the canal, up by the Port Arthur bridge, which was constructed before January 9, 1931.

The Sunoil never reached the passing place before the collision, nor do I believe she could have reached it before passing the Tustem, but the Eagle came through the passing place before the collision.

The steamship Eagle was above the Port Arthur bridge when the vessels observed each other.

The steamship Eagle was in charge of the pilot, McFarland, who had boarded her at dock Magpetco, below Beaumont. The pilot, master, and third officer were on the bridge, with a quartermaster at the wheel, and the chief officer and another man on the forecastle head, as the steamship Eagle proceeded down the canal; the tide being with her.

Above Port Arthur bridge, after observing the Sunoil, the pilot of the steamship Eagle was taking the headway off the ship, when she took a sheer to port, and her engines were put full ahead and then full astern, and the sheer was broken. Her engines were then put slow ahead, and she proceeded through the bridge and down the canal.

As the Eagle approached the Sunoil, the usual one-whistle passing signals for a port to port passing were exchanged, but shortly after the Eagle, when about 500 feet distant from the Sunoil, suddenly took a sheer to port. The Eagle, in an endeavor to break the sheer, put her engines full astern, and, when about 250 feet from the Sunoil, dropped her starboard anchor and sounded an alarm.

The Sunoil, observing the sheer of the Eagle, hesitated for about one-half minute, then put her engines half speed ahead for about one-half minute, and then full ahead

for one minute. The Sunoil did not sound an alarm.

The Sunoil during all of that time had continued bringing her head to the bank, and was as close as she could be, her head on the bank and her stern about 25 feet off the bank.

The Sunoil moved ahead up her starboard side of the canal, about 25 feet, between the time the Eagle commenced to sheer and the time of the collision.

The Eagle did not succeed in breaking her sheer, and came on into contact with the Sunoil, the bluff of the port side of the bow of the Eagle, about 35 feet abaft her stem, striking the Sunoil a glancing blow on her port side, about 75 to 80 feet abaft her stem, and passed on down the canal below the Sunoil, and not being able to stop, both vessels being injured.

The collision occurred while the Sunoil was over on her starboard bank of the canal, about one mile below the Port Arthur pleasure bridge. The channel at the point of collision was about 150 feet wide at the bottom and 200 feet wide on the top.

The collision resulted from the sheer, and, if there had been no sheer, there would have been no collision.

No one aboard the Eagle has offered any explanation for the sheer, and the collision was not the result of inevitable accident.

From the evidence, the only explanation for the sheer which I can find is that the Eagle was drawing 29 feet 4 inches, in a channel 30 feet deep; thus being only about 8 inches off the bottom.

This was a distinct fault on the part of the Eagle, as it is well known that it is difficult to steer properly with only a few inches of water under a vessel's keel.

There had been trouble previously with the steering of the Eagle, when deeply laden, with but little water under her keel; in fact, she had had trouble under such circumstances that very morning, above the Port Arthur bridge.

On the facts as found, the fault of the steamship Eagle is clearly established.

Having chosen to navigate with an unmanageable draft, the Eagle must be held to have taken the risk of just such an accident as occurred in this case. The Giove (C. C. A.) 27 F. (2d) 331.

On behalf of the steamship Eagle, which seeks to divide the damages, two principal charges of fault were made against the motor vessel Sunoil, first, that she should have reversed her engines following the sheer of the Eagle, instead of proceeding ahead as she did, and, second, that she should have proceeded ahead to a so-called passing place in the canal, just below the bridge at Port Arthur, instead of waiting for the steamship Eagle in the straight reach of the canal below Port Arthur.

Navigation in the Sabine-Neches Canal is governed by the statutes relating to navigation of vessels on the Red River of the North and rivers emptying into the Gulf of Mexico and their tributaries. Section 4233 of the Revised Statutes, as amended (title 33, § 301 et seq. U. S. C. [33 USCA § 301 et seq.])

Rule 21 of the Steering and Sailing Rules contained in that section (title 33, § 346, U. S. C. [33 USCA § 346]) provides as follows: "Every steam vessel, when approaching another vessel, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop and reverse; and every steam vessel shall, when in a fog, go at a moderate speed." Section 4412 of the Revised Statutes (title 46, § 381, U. S. C. [46 USCA § 381]) provides as follows: "The board of supervising inspectors shall establish such regulations to be observed by all steam vessels in passing each other, as they shall from time to time deem necessary for safety. * * *"

Under this section the board of United States supervising inspectors, steamboat inspection service, has adopted pilot rules for these waters, effective on and after April 1, 1911, and Rules II and III thereof provide as follows:

"Rule II. If from any cause the signals for passing are not made at the proper time, as provided in Rule I, or should the signals be given and not properly understood, from any cause whatever, and either steamer become imperiled thereby, the pilot on either steamer may be the first to sound the alarm or danger signal, which shall consist of four or more short and rapid blasts of the whistle. Whenever the danger signal is given, the engines of both steamers shall be stopped and backed until the headway of the steamers has been fully checked; nor shall the engines of either steamer be again started ahead until the steamers can safely pass each other. Steamers approaching each other from opposite directions are forbidden to use what has become technically known among pilots as 'Cross Signals'—that is, answering one whistle with two, and answering two whistles with one. In all cases, and under all circumstances, a pilot receiving either of the whistle signals provided in the rules, which for any reason he deems injudicious to comply with,

instead of answering it with a cross signal, shall at once observe the provisions of this rule."

"Rule III. When two steamers are about to enter a narrow channel at the same time, the ascending steamer shall be stopped below such channel until the descending steamer shall have passed through it; but should two steamers unavoidably meet in such channel, then it shall be the duty of the pilot of the ascending steamer to make the proper signals, and when answered, the ascending steamer shall lie as close as possible to the side of the channel the exchange of signals may have determined, as provided by Rule I, and either stop the engines or move them so as only to give the boat steerageway, and the pilot of the descending steamer shall cause his steamer to be worked slowly until he has passed the ascending steamer."

The fault of the steamship Eagle is plain and obvious, and this court will not be astute to find fault on the part of the Sunoil. The City of New York (Alexander v. Machan), 147 U. S. 72, 13 S. Ct. 211, 37 L. Ed. 84, 85; The Ludvig Holberg, 157 U. S. 60, 15 S. Ct. 477, 39 L. Ed. 620; The Coastwise (C. C. A.) 68 F.(2d) 720.

The rules and regulations, however, require under the circumstances as shown in this case that both vessels should have stopped and reversed their engines, and the rule is imperative. The Albert Dumois, 177 U. S. 240, 20 S. Ct. 595, 44 L. Ed. 751; The New York, 175 U. S. 187, 20 S. Ct. 67, 44 L. Ed. 126; A. H. Bull S. S. Co. v. United States (C. C. A.) 34 F.(2d) 614; The Quogue (C. C. A.) 47 F.(2d) 873, 874; Ellenor-Swiftarrow, 1930 A. M. C. 600; Beverly-Brinton, 1934 A. M. C. 316.

What would have been the effect of stopping and reversing in the instant suit is uncertain, but it rests upon the Sunoil to show beyond a reasonable doubt that it could not have avoided the collision, and the rule is imperative. The Fulton (C. C. A.) 54 F.(2d) 467.

This brings us to a consideration of the facts, which are very different from the facts in Ellenor-Swiftarrow, supra.

In the instant suit, the Eagle was only 500 feet from the Sunoil when she started to sheer. The Chief, which had the Eagle in tow, was on the opposite side of the canal, below the Sunoil, with a 400-foot hawser. Port to port passing signals had been exchanged, and it would have been impossible, if the Sunoil had reversed, to let the Eagle go down starboard to starboard between the Sunoil and the bank. The Sunoil was a single screw steamer, and, if her engines were put full astern, would have backed her stern to port and out in the canal, and her bow to starboard to the bank. The Sunoil was 480.6 feet long and the canal only 150 feet wide on bottom, and 200 feet wide on top, and therefore the Sunoil might have gone across the channel in the way of the steamship Eagle.

The Sunoil hesitated for about one-half minute, then went one-half speed ahead for one-half minute, and then full speed ahead for one minute, but during all of that time went ahead but 25 feet, and was struck by the Eagle on the port side of the Sunoil, 75 or 80 feet abaft her stem.

Had the Sunoil put her engines full astern as soon as the sheer of the Eagle was observed, I am convinced that the Eagle would not have gone clear, nor hit the bank.

As the Sunoil went ahead but 25 feet, I am convinced beyond a reasonable doubt that she would not have gone astern 50 or 55 feet on the bank as she was, as some time would have elapsed before she gained sternway, and the speed of the Eagle, which was coming down on the Sunoil at an angle, was so great that she did not stop for a long distance after striking the Sunoil.

By going ahead and holding to the bank as she did, the Sunoil gave the Eagle all of the canal possible in which to break her sheer, and, if she had succeeded, she would have gone clear. Had the Sunoil gone astern, she would have been pushed out from the bank, taking up more of the canal, and, even if the Eagle had broken her sheer, she would have struck the Sunoil farther aft.

The fact that neither Pilot McFarland nor Captain Ulsteen felt that the Sunoil was blameworthy for the action that she took, and that McFarland admitted that, faced with the situation which confronted the Sunoil, he might very well have done the same thing himself, convinces me that, even if the action of the Sunoil be considered an error, it was no more than an error in extremis. The Queen Elizabeth (C. C. A.) 122 F. 406; The Munrio (D. C.) 11 F.(2d) 900; The Lafayette (C. C. A.) 269 F. 917.

As to the alleged failure of the Sunoil to wait at a passing place.

There is no evidence that the Sunoil passed any passing place after she observed the Tustem and the Eagle.

Her navigation was proper under the rules, supra, as she had entered the narrow canal before observing the said vessels, and the pilot of the Eagle said he had passed twenty ships at approximately the place where the collision occurred.

Neither the Tustem nor the Eagle waited at the passing place through which both of them passed after observing the Sunoil, and therefore they have considered it safe to pass.

Further, the Sunoil could certainly not have reached the passing place before the Tustem came through it, and, with the Tustem coming down, could not have obeyed the rules and reached it before the Eagle passed through it.

On behalf of the Eagle, there was cited American Petroleum Co. v. Texas Co. (C. C. A.) 22 F.(2d) 290, but, if that case be in point, then the fault is in the Eagle, which passed through the passing place, and not in the Sunoil, which had not passed through any passing place, and never was able to reach the one below the bridge before the collision, as the Eagle did not stop there but came on down the narrow canal, where the Sunoil, in obedience to the rules, was holding close to the bank.

There are but two passing places in the canal, the one in question, which is 1,400 feet below Port Arthur bridge, and the collision occurred about a mile below that bridge, and the other is at Salt Locks, several miles above the bridge.

I have not considered any testimony offered to show the safety or lack of safety of passing places, as that question did not enter into this decision.

I conclude:

That the steamship Eagle is solely at fault in the first cause of action, in negligently navigating with a vessel so heavily loaded as to be so close to the bottom of the canal as to be an unmanageable draft.

Neither the libelant in the first cause of action nor the motor vessel Sunoil, nor any one for whose actions they or either of them are responsible in any way, negligently caused or contributed to the damages to the motor vessel Sunoil, and that they are wholly without fault.

That the libelant in the first above-entitled action, Sun Oil Company, is entitled to a decree against the steamship Eagle, with costs and the usual order of reference.

That in the second above-entitled action the motor vessel Sunoil was not guilty of any negligence, and did not negligently cause or contribute in any way to the damages to the steamship Eagle, and that the Motor Vessel Sunoil is wholly without fault.

That the Sun Oil Company, claimant of the motor vessel Sunoil, in the second above-entitled action, is entitled to a decree against the libelant, Standard Vacuum Transportation Company, dismissing the libel therein with costs.

That decrees may be entered in accordance herewith. Settle decrees on notice.

If this opinion is not considered a sufficient compliance with rule 46½ of the Rules in Admiralty (28 USCA § 723), proposed findings of fact and conclusions of law in accordance with this opinion may be submitted for the assistance of the court, as provided by the rules of this court.