**SEABOARD AIR LINE R. CO. v. THE PAN MARYLAND et al.**

**PAN AMERICAN PETROLEUM & TRANSPORT CO. v. SEABOARD AIR LINE R. CO.**

No. 523.

United States District Court
S. D. Georgia, Savannah Division.

April 3, 1952.

Seaboard Air Line Railroad Company (hereinafter called "Seaboard") brought a libel in personam in Admiralty against Pan American Petroleum & Transport Company (hereinafter called "Transport Company"), Owner of the Steam Tanker "Pan Maryland", and in rem against said vessel, to recover $108,561 damages to the pier of a bridge owned by Seaboard over the Savannah River, growing out of the collision of said vessel with the South pier of the bridge, while passing through its draw span. The collision was alleged to have been due entirely to faulty navigation of the vessel.

The Transport Company answered the libel and filed a cross libel against Seaboard. The answer and the cross libel admit the collision on the day stated, and deny that there was any fault in the navigation of the vessel. They allege that the bridge of Libellant had for a long time prior to this collision constituted a hazard to navigation upon the Savannah River; that twice previous to this accident it had been declared by the Secretary of War to be an unreasonable obstruction to the free navigation of the Savannah River due to the inadequate horizontal clearance through the draw span; and Seaboard was ordered by the Secretary of War to increase the width of the draw span to 200 feet. The Transport Company fur-

ther alleged that by reason of the construction of the piers supporting the bridge, particularly their inadequate penetration of the river bottom, the United States Corps of Engineers had for some years been unable to dredge in an area approximately 500 feet to the East and West of said bridge because of the danger of undermining said piers, as a result of which there is a shoaling in the channel for some distance on both sides of the bridge, and this shoaling makes extremely difficult and hazardous the navigation of vessels as they approach and pass through the inadequate draw span, the horizontal clearance of which at the time of this collision was approximately 116 feet. It was further alleged that the collision of the vessel with Libellant's bridge was not caused or contributed to by any fault or neglect on the part of the vessel or those in charge of her, but, on the contrary, said collision was inevitable due to a sheer which the vessel took to the left when 150 to 200 feet East of the bridge, this sheer being attributable to the aforementioned shoaling in the channel on the East side of the bridge.

Under an order approved by the parties, only the merits of the libel and cross libel were to be heard at this time, and the question as to the determination of damages was to be postponed for further consideration.

The Libel and Cross Libel were consolidated and heard together.

Connerat, Dunn, Hunter, Cubbedge & Houlihan, E. Ormonde Hunter, Savannah, Ga., for Seaboard Air Line R. Co.

Bouhan, Lawrence, Williams and Levy, George W. Williams, Savannah, Ga., for liability insurance carrier on Seaboard Air Line Railroad Co.'s bridge.

Lawton & Cunningham, Julian C. Sipple, Savannah, Ga., and Herbert P. Reid, New York City, for Pan American Petroleum & Transport Co. and others.

SCARLETT, District Judge.

### Findings of Fact.

1. On April 22, 1950, about Noon time, the weather being clear and practically no wind, the Steam Tanker "Pan Maryland",

owned by the Transport Company, a Delaware Corporation, was proceeding upstream in the Savannah River, fully laden with a cargo of petroleum to be discharged at her dock at Savannah West of the bridge, and with a draft of 28 feet 3 inches. At this time there was slack high water at the bridge. The vessel was built in 1938, is 440 feet in length, 66.8 feet beam, and is of a gross tonnage of 7,701. A pilot boarded the vessel at the bar, and was in charge of her navigation at the time of the collision.

2. The vessel, at a point some 200 feet down stream or East of the bridge, took a sudden and irresistible sheer to the left which she could not overcome and immediately thereafter her port bow collided with the pier forming the South abutment of the draw span, this span being 116 feet in width.

3. The bridge involved in this collision was erected about the year 1900 over the Savannah River, pursuant to authority contained in a special Act of Congress approved February 2, 1899, 30 Stat. 813, which provided in part that the bridge should "be so constructed, by draw span or otherwise, that a free and unobstructed passage may be secured to all vessels * * navigating said river". Also that "said bridge shall be at all times so kept and managed as to offer reasonable and proper means for the passage of vessels through or under said bridge".

4. Since the bridge was built in 1900, the depth of the river channel upstream of this bridge has been increased to 30 feet and several large undustries have been located upstream. The vessels which pass through the bridge are much larger than when the bridge was built.

5. As early as March 30, 1934, the Savannah Port Authority, of which Robert W. Groves was President, called attention to the inadequate draw span of the bridge and requested the United States District Engineer to hold a hearing on the matter. Accordingly a meeting was had at which Seaboard officials and other interested parties were present and it was then insisted that the span of the bridge was inadequate and would have to be widened to meet the requirements of the increasing traffic through the bridge and the increasing size of steamers serving industries located above the bridge. By an Act of the Georgia Legislature approved August 14, 1925, Acts 1925, p. 1451, Savannah Port Authority is a body corporate and has broad powers with reference to the commerce and traffic of the harbor and port of Savannah, and the construction and, alteration of harbor structures on the Savannah River.

6. October 29, 1936, another meeting was held, this one taking place in the City Hall of Savannah, at which Seaboard officials and others interested were present and at which the President of the Port Authority presided and made a statement as to the inadequacy of the span. The officials of the Seaboard were again urged to give their immediate attention to the reconstruction of the bridge.

7. April 23, 1937, Seaboard made application to the Secretary of War for approval of plans for the reconstruction of the bridge, providing for a vertical lift span with a horizontal clearance of 200 feet, this to be located North of the then existing span and normal to the axis of the channel. On June 21, 1937, the said plans were approved by the Secretary of War, and it was ordered in said approval that the work should be completed by Seaboard by June 29, 1940. Under these plans a channel depth of 34 feet at mean low water was to be provided through the bridge.

8. February 28, 1938, Seaboard applied for an extension of time to begin the reconstruction of the bridge, and the Secretary of War extended the time for the beginning of the work to June 15, 1939, the alterations to be completed by June 29, 1940.

9. January 10, 1939, the President of the Port Authority wrote to the General Manager of the Seaboard, emphasizing the importance of expediting the reconstruction of the bridge, and the General Manager of the Seaboard advised the President of the Port Authority that Seaboard did not contemplate at that time asking for any extension beyond June 1940. Again on August 8, 1939, and February 25, 1941, public hearings were held by the United States Engineers

at Savannah, at which it was insisted that Seaboard should expedite the reconstruction of the bridge.

10. October 17, 1939, the Secretary of War, acting pursuant to law, declared the bridge to be an "unreasonable obstruction to the free navigation of the Savannah River" due to the inadequate horizontal clearances through the draw span, and ordered the Seaboard and its Receivers to alter the bridge so as "to provide a draw span affording a horizontal clearance of not less than 200 feet, normal to the axis of the channel". Seaboard, although under the orders of the Secretary of War to complete the reconstruction of the bridge by June 29, 1940, did not comply with the orders of the Secretary of War. The record shows that the Seaboard procrastinated for financial reasons and because of the legislation pending in Congress and next referred to.

11. At the time Seaboard secured the 1937 permit hereinbefore mentioned, legislation was pending in Congress to reimburse railroads for a large part of the cost of reconstructing bridges over navigable streams. This legislation was finally passed June 21, 1940, 54 Stat. 497, 33 U.S.C.A. § 511 et seq. Section 2 of this Act provides "No bridge shall at any time unreasonably obstruct the free navigation of any navigable waters of the United States".

12. On December 14, 1940, the Secretary of War withdrew the order of October 17, 1939. The Attorney General of the United States advised the Secretary of War to withdraw the order of October 17, 1939, because it was passed before the Act of June 21, 1940, and because it was evident Seaboard was not going to abide by the order, and the Attorney General further advised that the Secretary of War should then proceed to issue a new order.

13. June 21, 1941, the Savannah Port Authority was advised by the District Engineer's office that no order was then to be issued requiring the alterations of the bridge due to the need for war purposes of the materials which would go into the bridge. November 13, 1945, the President of the Port Authority addressed a letter to the United States District Engineer at Savannah, stating that, as the war had come to an end, it was hoped that the Chief of Engineers would issue an order requiring the Seaboard to make the necessary changes in the bridge.

14. The need for reconstruction of the bridge was again called to the attention of the Seaboard by the Savannah District Engineer on December 17, 1945, and on February 23, 1946, the Secretary of War passed an order and again declared said bridge to be "an unreasonable obstruction to the free navigation of the said Savannah River (a navigable waterway of the United States), due to inadequate clearances through the draw span of said bridge", and ordered Seaboard Air Line Railway and its Receivers "to provide a draw span therein affording at least horizontal clearance normal to the channel of 200 feet".

15. Then on June 26, 1950, after an interval of more than 4 years from the order of February 23, 1946, the amended plans for reconstruction of the bridge were completed and the final bid of contractor accepted by the War Department, authorizing the beginning of the work. The alteration of the bridge is presently in progress.

16. Not only was the bridge a menace to navigation because of its narrow span, but the span itself, not being at right angles to the channel, added to the difficulties of navigation of large, deep draft vessels such as this vessel through the span. The angle of the span to the channel required a vessel proceeding on the course on which the "Pan Maryland" was proceeding to begin to turn to port toward the span at a distance of approximately 800 feet therefrom, and while the vessel is in the span a sharp turn to the right is required of ships proceeding upstream. The orders of the Secretary of War required the span of the bridge to be moved to the North so as to be on the axis of the channel and the plans prepared and submitted by Seaboard to the Secretary of War April 23, 1937, provided for such a change.

The Shoal Water at the Bridge
and its Approaches.

17. Another hazard to navigation at the bridge when this collision occurred was the shoaling of the channel at the span of

the bridge. Because of the insufficient penetration into the river bottom of the bridge pier footings, the United States Engineers had not, for some years prior to this collision, been able, without endangering the structure, to maintain the depth of the channel by dredging. June 18, 1946, the Chief Engineer of Seaboard, in a letter to the United States District Engineer at Savannah, wrote:

"In view of the elevations of the pier footings as determined from our record drawings, I think it would be very unwise to attempt any additional dredging at this point before the new bridge is constructed, unless extensive protective works are built around the present piers before the dredging is started."

18. A plat or fathometer reading of soundings taken April 5, 1950, just two weeks prior to the collision, by the United States Engineers of the depth of the water at the draw span of the bridge and at its approaches is in evidence. This plat shows a plateau-like formation of the river bottom in this locality. In the middle of the draw span the minimum depth of the water was 26 feet at mean low water, and at a distance downstream of 200 feet from the bridge, the minimum depth of the water was about 26½ feet. At the time of the collision the tide had risen 5½ feet, making the total minimum depth of water 200 feet from the bridge approximately 32 feet when the accident occurred. The draft of the vessel was 28 feet 3 inches.

### The Navigation and Handling of the Vessel.

19. The "Pan Maryland" approached the bridge on a course slightly to the right of the center of the channel. When she got within about 800 feet of the bridge, it was necessary for her to bear to the left to approach the draw. When she got within about 200 feet of the draw, she was inclined to work her head to the right. To overcome this, the vessel was given about 15°, then 20° left wheel and, as she still did not respond, she was given more left wheel. She was then smelling bottom because of the shoal in the channel already referred to,

and took a sudden and irresistible sheer to the left and did not respond to a hard right wheel and to full speed ahead on her engines, which was intended to give her steerage way and make her respond more quickly to her rudder. Just before the impact, the Pilot ordered the engines full astern. After the commencement of the sheer, the collision was inevitable and the vessel struck the left or South pier of the draw span with her port side a short distance from her stem.

20. The only witnesses for Libellant as to the navigation of the "Pan Maryland" were Admiral James L. Ahern, Retired of the Coast Guard and H. P. Murphy, Claim Adjuster of the Seaboard Air Line. While Admiral Ahern had some years ago been in command of a Coast Guard Cutter at Savannah, which was a much smaller vessel than the "Pan Maryland", he had never taken this Cutter or any other vessel through this span—in fact, he testified that he had never been through the bridge on a ship. Admiral Ahern was not a witness to the collision, but was engaged to testify as an expert witness for Seaboard, and quite some time after the accident he several times observed from this bridge the navigation of certain vessels about the size of the "Pan Maryland" as they approached and passed through the span. He testified that it appeared to him during his observations that all the vessels he watched were, beginning at a point ⅜ of a mile downstream from the bridge, on a straight line or course at right angles to the draw span and that they followed this straight line through the bridge. Also that, if the "Pan Maryland" had been on and followed this course, the maneuvers which she followed in approaching the bridge would not have been necessary. The testimony of Mr. Murphy, also based upon observations he had made from the bridge and from a small vessel in the draw span, was to the same effect. Mr. Murphy is not and did not attempt to qualify as an expert in navigation.

21. On the other hand, the course on which the "Pan Maryland" approached the span was shown upon a chart placed in evidence by the Transport Company, and

this was the usual and proper course to follow according to the testimony of the Master, who had taken vessels through this draw on several occasions, Chief Mate Casey, Pilot Clark, who was in charge of the ship's navigation and who was thoroughly familiar with the Savannah Harbor, Mr. Robert W. Groves, President of the Savannah Port Authority, Chairman of the Board of Strachan Shipping Company and South Atlantic Steamship Line and President of Atlantic Towing Company, who had passed through the draw on large vessels on several previous occasions, Frank W. Spencer, General Manager of the Atlantic Towing Company and former Master Pilot for the Savannah Bar but now retired, and of J.P. Browne, one of the oldest of the Savannah Bar Pilots in point of service. The testimony also showed, and I so find, that it was impossible, due to the position of the span, for a vessel the size of the "Pan Maryland" to have been on a straight line with the draw ⅜ of a mile down stream from the bridge. This would put the vessel out of the channel. Witnesses Groves, Spencer and Browne have no interest in this case.

22. The "Pan Maryland" was in charge of a competent and skilled Pilot, who testified that his orders were carried out by the helmsman. Both the Master and Chief Officer were competent, skilled and experienced navigators and they also were familiar with navigation through this bridge.

23. While hundreds of vessels have passed through the bridge without any accident, there were occasions prior to this collision when large ships, because of the draw span and other hazards existing there, made contact with the abutments of the span, and at least one of such vessels suffered severe damage.

24. As will be noted from the Conclusions of Law which follow, the testimony of the persons on board the "Pan Maryland" when this collision occurred was more satisfactory, and greater weight is to be given thereto, than testimony from persons not on the ship and who did not witness the accident.

25. I find from the greater weight of the evidence, that the "Pan Maryland" on this occasion approached the span on the usual and proper course, that she was properly and skilfully navigated, and that the collision was not due to any fault or negligence on the part of the "Pan Maryland" or of those handling her, but to the hazards of the draw span, and its approaches and the shoaling in the channel.

From the foregoing Findings of Fact, the Court has reached the following conclusions:

## Conclusions of Law.

1. In this case there was no presumption of negligence against the vessel because the bridge was an unreasonable obstruction to navigation and, therefore, an unlawful structure. This conclusion of law is supported by the decisions cited below in paragraphs 6 and 8.

2. The testimony of those on board the "Pan Maryland" as to what occurred at the time of the collision was more satisfactory and greater weight is to be given thereto than that of others who were not on board the vessel and whose statements were based merely upon observations made many months thereafter. The Fannie, 11 Wall. 238, 242, 20 L.Ed. 114; The Alexander Folsom, D.C., 52 F. 403, 411; Kelley Island Line & Transport Co. v. City of Cleveland, D.C., 47 F.Supp. 542.

3. As has been stated in the Findings of Fact, the collision was not due to any negligence or fault of the vessel or those navigating her, but was due solely to the hazards of the draw span of the bridge and its approaches and the shoaling in the channel. The Court, therefore, finds and concludes that neither the vessel nor her owners were at fault and, that, therefore, Libellant, Seaboard, is not entitled to recover any damages on its libel brought in personam against the Transport Company and in rem against the "Pan Maryland".

4. After conferences and meetings on the subject of the hazards and inadequacy of the bridge, Seaboard on April 23, 1937, made application to the Secretary of War for the approval of plans for the reconstruction of the bridge, providing for a vertical lift with a clearance width of at

least 200 feet and for the location of a span to the North of the existing draw span. The plans were duly approved by the Secretary of War, the work to be completed June 29, 1940. Subsequently on October 17, 1939, the reconstruction of the bridge not having then been started, the Secretary of War declared the bridge to be "an unreasonable obstruction to the free navigation in the Savannah River" due to the inadequate horizontal clearance through the draw span and Seaboard was ordered to alter the bridge so as "to provide a draw span affording a horizontal clearance of not less than 200 feet normal to the axis of the channel". It appears that due to the cost of the work, and the fact that there was pending in Congress a bill to reimburse railroads for part of the cost of reconstructing bridges over navigable streams, the Seaboard procrastinated in the work of reconstructing the bridge, and it was not reconstructed by June 29, 1940, as required by the orders of the Secretary of War. The Seaboard could not lawfully delay the work for its own benefit and convenience, at the risk and hazard of vessels which had to pass through the bridge. Work on the reconstruction of the bridge did not start until after this accident.

■ 5. The United States Engineers have not been able to dredge the channel as it approached the bridge, or the channel in the span, or as it left the bridge, because of the insufficient penetration of the river bottom by the pier footings. It was recognized nearly four years prior to the collision by the Chief Engineer of the Seaboard that it would be unwise to attempt any dredging at those points before the new bridge was constructed. The consequence of this was that the channel had shoaled considerably, a fact which caused the sudden sheer of the vessel shortly before it reached the bridge. Having found that the collision was due solely to the fact that the bridge was an unreasonable obstruction to free navigation and to the shoaling of the channel which was due to inability to dredge because of the construction of the bridge, unmixed with any negligence or fault of navigation on the part of the vessel, the Court finds that the Cross-

Libellant, Pan American Petroleum & Transport Company, owner of the "Pan Maryland" is entitled to recover from Seaboard such damages as it may be able to prove.

■ 6. Although the bridge may have been a lawful structure at the time it was built, the owners of the bridge were under the duty to maintain it so that it would not become an unreasonable obstruction by reason of changed conditions and increased demands of commerce and navigation. The Seaboard failed to perform this duty though requested by interested parties to do so over a period of 25 years. This principle has been well decided in the case of People ex rel. Hayne v. Metropolitan West Side Elevated Ry. Co., 285 Ill. 246, 120 N.E. 748, the third head note of which is:

"Although an elevated railway company's bridge across South branch of Chicago river was built by authority of law, state and federal, it did not remain a lawful structure, where, by reason of changed conditions and increased demands of commerce and navigation, it became an unreasonable interference with traffic on the river."

■ It is inconceivable that there could be any basis in law or fact for Seaboard's contention that once its bridge was approved by the Secretary of War, it could not constitute a hazard or obstruction to navigation and that, in the absence of a specific directive from the Secretary of War to alter the bridge, the Railroad was powerless to initiate any steps toward correcting the extremely hazardous and unsatisfactory condition existing at the bridge insofar as navigation was concerned.

■ 7. Moreover, the declarations of the Secretary of War that the bridge was an unreasonable obstruction to navigation are conclusive and binding upon the bridge owner. Union Bridge Co. v. U. S., 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523; U. S. v. Monongahela Bridge Co., 216 U.S. 177, 185, 30 S.Ct. 356, 54 L.Ed. 435; Louisville Bridge Co. v. U. S., 242 U.S. 409, 37 S.Ct. 158, 61 L.Ed. 395.

■ 8. On the question of the presumption of negligence, Judge Soper, of the

Virginia District, stated the rule in United States v. Norfolk-Berkley Bridge Corporation, D.C., 29 F.2d 115, 125, as follows:

"On the other hand, the rule as to a bridge which is an unlawful obstruction to navigation is different. While such a structure may not be injured negligently by a passing vessel with impunity, nevertheless the vessel which strikes it is not presumptively negligent or careless, but the bridge owner is presumptively at fault, unless he can show that the failure to comply with the requirements was not one of the factors or causes which contributed to the injury. The bridge owner is entitled to recover from the ship only if he can show that the failure to comply with the law was in no way responsible for or contributed to the accident or disaster."

■ 9. The Transport Company offered in evidence the depositions of Charles Trainor and Ralph Rhodes, along with one exhibit to Trainor's testimony and numerous exhibits to that of Rhodes. Mr. Trainor is one of the senior officials in the office of the United States District Engineer at Savannah, and his testimony in the main consisted of his reading a short extract from a report (the extract being offered in evidence) he had personally prepared and which dealt with the Seaboard's failure to properly maintain the fender system at its bridge. Mr. Rhodes, prior to his retirement in 1949, was for a good many years Senior Engineer in this same office. His qualifications as an Engineer were conceded by Libellant's Counsel when the deposition was taken. He personally gave the matter of Seaboard's bridge and the need for alterations therein considerable handling while on the staff in the Engineer's office. Some of the numerous records, as well as reports and copies of letters he testified from, were prepared or written by him, though the majority were written by Colonel Fowler, one of the District Engineers at Savannah, who is now deceased. The entire record of the Engineer's office from which Mr. Rhodes testified was properly authenticated under seal of that office in accordance with the Rules of Civil Procedure, and the exhibits,

all photostats of the original records, were likewise authenticated. All of these records were made and the letters were written in the regular course of business of the District Engineer's office. Nevertheless, Libellant's Counsel interposed the following objection at the conclusion of the deposition:

"We object to all the testimony offered by this witness except as to his name and his qualifications as an engineer, the opinion of the Attorney General and chart of the Savannah River and data of 400 foot channel, on each of the following grounds:

"1. When the bridge having been constructed in accordance with the orders of the Secretary of War, the bridge cannot constitute a hazard or obstruction to navigation or the wisdom of the construction be subject of a judicial investigation;

"2. All preliminary negotiations merged into the orders of the Secretary of War;

"3. Orders of the Secretary of War speak for themselves;

"4. Most of his testimony has been annulled by an Act of Congress, and

"5. If proof is attempted, the order of the Secretary of War should be proved by exemplified copies.

"Subject to those objections, we would like to ask the witness a few questions."

When the depositions and exhibits were offered in evidence in open Court, Counsel for Seaboard objected to their admissibility and indicated his objection reverted back to his main objection quoted above.

During his cross-examination, Seaboard's Counsel had the witness testify from and read into the record certain portions of the records Libellant had objected to. The originals of the October 17, 1939, and February 23, 1946, orders of the Secretary of War served on Seaboard are in evidence in response to a notice to produce, as are the originals of numerous of the letters from the District Engineer to Seaboard, copies of which Mr. Rhodes testified from.

Title 28 U.S.C.A. § 1732, provides in part as follows:

"(a) In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

"The term 'business,' as used in this section, includes business, profession, occupation, and calling of every kind."

Section 1733 of the same Title reads:

"(a) Books or records of account or minutes of proceedings of any department or agency of the United States shall be admissible to prove the act, transaction or occurrence as a memorandum of which the same were made or kept.

"(b) Properly authenticated copies or transcripts of any books, records, papers or documents of any department or agency of the United States shall be admitted in evidence equally with the originals thereof."

The exhibits referred to, upon being offered in evidence, were taken subject to later ruling as to their admissibility. They were all written in the usual course of business of the Engineer's office, and most of them dealt with the efforts of the District Engineer to have Seaboard correct the hazardous situation at its bridge. My opinion is, and I so rule, that the testimony, as well as the letters, reports, records, etc., are admissible but, even if they were not a part of the record, my Findings of Fact and Conclusions of Law would be the same, based on the other evidence in the record.

10. The conclusion of the Court is that this bridge was an unreasonable obstruction to the free navigation of the Savannah River, and that the cause of the accident was the shoaling of the channel and the inadequacy of the span for both of which the owner of the bridge is responsible, and that the accident was caused by the negligence of the owner of the bridge, unmixed with any fault on the part of the ship or those navigating it who acted in accordance with recognized principles of good seamanship.

The Court will appoint Frank Cheatham, Jr., Esq., of Savannah, Ga., as Special Master to ascertain the damages incurred by the Pan American Petroleum & Transport Company.

Let an interlocutory decree be taken in conformity herewith.