## SEABOARD AIRLINE R. CO. v. PAN AMERICAN PETROLEUM & TRANSPORT CO.

### THE PAN MARYLAND.

### No. 14179.

United States Court of Appeals
Fifth Circuit.

Nov. 15, 1952.

Rehearing Denied Dec. 12, 1952.

E. Ormonde Hunter and George W. Williams, Savannah, Ga., for appellant.

Julian C. Sipple and A. R. Lawton, Savannah, Ga., Herbert P. Reid, New York City, for appellee.

Before HUTCHESON, Chief Judge, and HOLMES and RUSSELL, Circuit Judges.

HUTCHESON, Chief Judge.

About 12 o'clock noon on a bright clear day, without the interference of wind, wave, or vessel, the Tanker Pan Maryland, while endeavoring to pass through the Seaboard drawbridge over the Savannah River, struck the bridge at such speed and with such force as to cause serious damage to it and to the tanker itself.

Libellant, to recover the damage to its bridge, filed two libels,[1] one in rem against the tanker, the other in personam against her owner.

The Pan Maryland and her owner answered denying all the charges of negligence and alleging that she was proceeding properly and on the customary course when, because of the shoaling of the channel existing in the vicinity, and because, of the bridge, she took a sheer, and, the vessel not responding to the rudder, collided with the bridge.

There was a further allegation that the bridge constituted an unreasonable and unlawful obstruction to the free navigation of the river due to inadequate horizontal clearance through the draw span, and that it was because thereof and of the shoaling due to the fault of libellant, and

1. The libel charged negligence in the following particulars:

(a) In steering the ship into the bridge pier.

(b) In putting the helm hard to left.

(c) In holding the helm hard to left.

(d) In failing to sooner swing the helm to the right.

(e) In giving the ship full speed ahead while in the draw and headed directly for Libellant's pier.

(f) In failing to reverse engines in effort to stop or slow the speed of the vessel when the danger of striking Libellant's pier became apparent.

(g) In failing to approach the bridge on a straight course (for at least the last ⅜ of a mile), the said proper course being a straight line parallel to the bridge support piers midway between the said piers.

(h) In attempting to effect, in close proximity to the bridge, maneuvers which required two sharp changes of direction.

(i) In bringing the ship into the draw sideways.

not because of any fault on the part of the vessel, that the collision came about.

Pan American, in a cross-libel containing substantially the same allegations as those which had been set forth in the answer,

sued for the damages the collision had caused the Pan Maryland.

The consolidated causes coming on for trial, the facts [2] were fully developed, and the district judge, after hearing the argu-

2. In substance these are:

The Seaboard Bridge had been constructed in 1899 under an Act passed by Congress and with the approval and authorization of the Secretary of War. In 1908 structural changes fixing the width of the draw opening at 120 feet were authorized and approved by the Secretary of War. From that time no substantial alteration in the construction of the bridge or its approaches had been made. A fender system had been installed which reduced the width of the draw from 120 to 116 feet. This work was authorized and approved by the Secretary of War in 1929. Some protective steel piling had been driven down into the river bottom around the pier foundations, with the approval of the Secretary of War, in 1934; but this did not reduce the width of the draw or interfere with the navigation of vessels passing through. No other changes had been made since the original construction.

By order of Secretary of War Patterson dated Feb. 23, 1946, the Seaboard was ordered to renovate the bridge by relocating, changing the type of draw and providing a width in the new draw of 200 feet.

Work on the renovation pursuant to this order was not authorized by the United States Government until June 26, 1950, when the Government awarded the job and approved the bid of contractor to do the work. This was over two months after the collision.

Pier 4 was to have been a part of the renovated bridge. As a result of the collision it was determined by the United States Government to be unsafe as a part of the new bridge and ordered replaced. Temporary emergency repairs were necessary to continue the railroad's operations and during that time it was necessary to reroute trains at considerable additional expense.

The renovation of the bridge with the new draw 200 feet in width was ordered to keep abreast of the development of the harbor of Savannah above the bridge and for the benefit of navigation, making possible use by larger boats having greater draft, at all times and all tides. The renovated bridge was of no advantage to rail travel. The existing bridge was satisfactory.

From 1918 to April 22, 1950, when this

collision occurred, some 1771 vessels had passed through the draw of the bridge. Since these vessels returned through the draw, the total number of passages through the bridge amounted to 3,542; 670 out of the total of 1771 vessels passing through the draw were vessels owned or operated by Pan American. After the date of the collision, 227 vessels had passed through the draw up to the time of the trial.

During all these years, when so many vessels had passed up and down the river through the draw from 1918 to the date of the trial, there was only one other instance of a vessel (also Pan American) sustaining any material damage in passing through the draw. This scraping of the bridge abutment was attributed by that vessel, the "Pan American", to a "sudden squall".

As the Pan Maryland approached the bridge on the day of the collision, her navigation was in complete charge of a river pilot, Clark, who had had thirty-two years of experience on the Savannah River, and had taken many vessels, similar to the Pan Maryland through the draw. The Captain of the Pan Maryland had himself made approximately thirty round trips through the bridge on Pan American vessels. Both men, therefore, had full knowledge of all of the conditions which they would encounter in taking the vessel through the draw.

According to the pilot's testimony, the ship responded properly to her rudder on her way up the river. As she approached the bridge the pilot put her on what he stated to be the usual and proper course up the river, namely, a course a little bit to the right or to the north of mid-channel. (The river runs approximately east-west.) When the Pan Maryland was about opposite target, or at a point approximately 1000 feet from the bridge, the pilot started to swing the ship a little to the left and checked her a little bit; then he swung her a little more to the left and again checked her a little bit. When the ship was about 250 feet from the bridge, she had a tendency to go to the right. To overcome this the pilot had the wheel put to the left some ten or fifteen degrees, but the ship did not seem to respond to this wheel movement. He then gave her more left wheel and finally put the wheel hard over to the

ments of counsel, concluded and held: that the libellant's bridge "was an unreasonable obstruction to the free navigation of the Savannah River; that the cause of the accident was the shoaling of the channel and the inadequacy of the span, for both of

left. When the ship eventually responded to these movements of the wheel and started to swing to the left, the wheel was put hard over to the right. Since the ship was going slow ahead, the pilot did not think she had enough rudder power. Accordingly, he put the engines at full speed ahead. These maneuvers were not successful because "the vessel was too close" and her swing to the left too strong. When the pilot saw that collision with the bridge was about to occur, he put the engines full speed astern. Nevertheless, the Pan Maryland crashed into the pier foundation on the left hand or southern side of the channel, causing heavy damage to the bridge and to the tanker.

The Seaboard's witness, Admiral Ahern, a retired United States Coast Guard Officer with 20 years service at sea in all positions including that of navigator and commanding officer, testified that he was familiar with the Savannah River and, upon the engagement by Seaboard, had studied the approach to the bridge in question and river charts; that the safe and proper approach from the Ocean side would be to get on a base course about ⅜ of a mile from the bridge and hold it through, on a straight line with only minor helm adjustments to hold the course. The base line is a straight line passing through the center of the draw span parallel to faces of the draw span. Such a course is shown by red line on Seaboard's Exhibit 1 in Specie. The Pan Maryland did not follow this base course in approaching the draw on April 22, 1950. According to the pilot's and mate's depositions she did not follow the base course at all but she turned and kept to the North Shore of the Channel and then swung from the North shore back towards the draw under left rudder. At one time she was hard left. Then, the pilot gave her full right rudder and then full speed ahead and when she did not respond to such rudder. These maneuvers were very close to the bridge.

The method of approach followed by the Pilot was not a seamanlike and proper approach. Any deviation from the stated base line increases the danger. If you are on the base course, there is less danger if she sheers.

After making these general observations Admiral Ahern then testified as to his observation from a position on the bridge on the northern side of the draw of the actual passage of vessels through

the draw, all piloted by pilots of the same pilotage association. Five of these were Pan American's ships. All approached and entered the draw on a straight line from approximately three-eighths of a mile on the base course prescribed by him. None took the complicated maneuvers described by the pilot of the Pan Maryland as necessary and proper.

Ahern also testified that conditions were perfect when the S/S Pan Maryland approached bridge on April 22, 1950, high slack water, no wind, bright clear daylight.

"With these conditions it is safe to navigate a vessel with a beam of 68 feet through an opening of 116 feet.

When the vessels which I observed went through subsequently, they had 8 to 10 feet less clearance as the emergency repairs cut down on the width span."

He further testified that in his opinion the Pan Maryland had too little speed for steerageway, which was what caused the loss of control.

If the S/S Pan Maryland had reversed her engines when she first got into difficulty, she would not have gone into the bridge. She had no way on and there was no current.

It was established that at the time of the collision the depth of water below the bridge was 32 feet. The draft of the ship was 28.3 feet.

The pilot in control of the Pan Maryland testified:

"I have been a bar pilot for 30 years. I was pilot on the Pan Maryland on April 22, 1950. I went aboard the ship at the entrance of river in time to reach the Seaboard bridge at slack high water. She was 470 feet long. In coming up the river she properly responded to rudder movements. I have taken hundreds of vessels through the draw including deep draft tankers. The tide conditions were favorable at the bridge. I followed approximately the course shown by red line on Pan American's Exhibit 40. When I said I was hugging the north bank, I meant that I was holding the northern half of the channel. At target 108 I usually haul down toward the opening of the span by starting the ship to the left. She was drawing 28.3 feet. About 250 feet from the bridge the ship had a tendency to steer to the right. I gave her 10 or 15 degrees left and as she did not respond, I found it necessary to

which the owner of the bridge is responsible; and that the accident was caused by the negligence of the owner of the bridge unmixed with any fault on the part of the ship or those navigating it who acted in accordance with recognized principles of good seamanship". So holding, he entered an interlocutory decree denying libellant any, and awarding cross-libellant full, recovery. 105 F.Supp. 958.

Complaining that the findings of the district judge are without substantial support in the evidence, indeed contrary to the truth and right of the case, and that the decree denying libellant the recovery it sought while awarding the respondent full damages, is without substantial support in the evidence, libellant is here seeking its reversal. Pointing to the undisputed fact that the bridge was not an unauthorized but an authorized structure, it insists that the damage to it, a completely stationary object, must be held to have been solely caused by the negligence of the Pan Maryland, which, moving under its own power, was so maneuvered as to run under full speed ahead bell, into, and collide with great force, with, the bridge. So pointing, it urges upon us that the evidence demanded a finding that the injury and damage was proximately caused by the negligence of the Pan Maryland without contributing fault on the part of Seaboard, and that the decree should be reversed and a decree entered in this court, or, upon directions, in the court below, awarding libellant full damages and denying cross-libellant's claim. We agree.

It will serve no useful purpose for us to set the evidence out further than we have already done. It is sufficient to say that while it presents some conflict of view as to the course on which the vessel should have approached the bridge and some conflict of opinion as to what actually caused the collision, it shows with crystal clearness, from the testimony of the pilot himself, that the maneuvering was attended with negligence not only in the orders given leading up to, but particularly in the order for full speed ahead given just before the impact which converted what might have been a mere rubbing or scraping without injury to the bridge or boat into a ramming with great force and disastrous consequences.

Under these circumstances, where the active and effective cause of the collision was the culpably negligent navigation of the vessel, if the bridge had been, as it was not, an unlawful structure, if libellant had been, as it was not, responsible for the shoaling complained of, and the shoaling, as it was not, had been a contributing cause of the injury, the most that appellee could possibly contend for would have been divided damages. Atlee v. Union Packet Co., 21 Wall. 389, 88 U.S. 389, 22 L.Ed. 619; The Baker Bros., 2 Cir., 260 F. 650; [3] U. S. v. Norfolk-Berkley Bridge Corp., D. C., 29 F.2d 115, relied on by appellee.

give her more wheel—hard over at one time—and when the ship responded and started to come, I put the wheel hard right and due to the fact that I was going slow ahead—she did not have rudder power enough. When she lost steerageway I gave her full ahead. The vessel was too close to the bridge. I think she was—she must have smelt bottom. It was too close to drop anchor. My orders were carried out at the wheel."

There was a great deal of other testimony for the Pan Maryland presenting, more or less varying views as to the usual course for vessels approaching the bridge, and generally to the effect that the passage through the draw is a hazard to ships under the best of conditions because of insufficient width and because of a very bad angle. There was a general agreement that because of the location and the lack of horizontal clearance, the passage through the draw is hazardous to larger vessels except during favorable conditions of wind and tide, but that if all of those favorable conditions are present, it is a reasonably safe passage.

3. In this case, it was held that even in the case of a vessel unlawfully moored, in violation of an express pier end statute, so as to obstruct navigation, the moving vessel colliding with it should be held guilty of contributory fault if the obstruction is manifest, and collision with the moored vessel could have been avoided by the exercise of a proper degree of care.

When, as the record shows to be the case here, the conditions claimed to be unlawful or negligent are entirely passive and have existed for many years to the knowledge of the moving vessel; when, too, the evidence is, as here, uncontradicted that, while these conditions do tend to make the passage more difficult than if they did not exist, a passage can be safely made under the conditions if due care is exercised; there is no basis in the record even for a division of the damages in favor of the actively negligent moving vessel, much less for awarding it full damage. Texas & P. Railway Co. v. Angola Transfer Co., 5 Cir., 18 F.2d 18, 20, where it is stated:

> "We think appellant was entitled to rely upon boats passing through the draw navigating carefully and keeping in the middle of the stream, or at least avoiding contact with the piers."

See also, West India Fruit & S.S. Co. v. Raymond, 5 Cir., 190 F.2d 673, at page 674, where the court said:

> "The master of the Parrott had timely notice of the presence of the Lev-Lou and it was his obligation to see to it that his vessel did not pass at such speed that danger would result from her suction or swells and he is responsible for their effects upon innocent vessels. The Hendrick-Hudson, D.C., 163 F. 862, 865, affirmed 2 Cir., 168 F. 1021.
>
> "The fact of injury to the Lev-Lou from swells prima facie establishes the liability of the Parrott. And since she was the moving vessel she must exonerate herself from blame by showing that it was not in her power to prevent the injury by adopting any practical precautions. Ferryboat Columbia, 1937 A.M.C. 881, 882, 884. This she failed to do."

That the bridge was an obstruction to the free navigation of the river may not be doubted, for with the bridge not in place the channel would be wider at that point, the going would be easier, and navigation would not be slowed up or made difficult.

To say, however, that this bridge was, as nearly all bridges are, an obstruction to free navigation, is not to say, as the district judge in effect did, that it was an unlawful structure, that is, that its mere existence was in violation of law and, because a vessel collided with it, the owner of the bridge would be liable.

The record does show that there have been long standing complaints about the condition of the bridge and that the correction of the conditions obstructing navigation on the river has been long overdue. The undisputed facts as to these matters, however, do not support the finding in law that at the time of the collision the bridge was an unlawful structure, or that its existence was in and of itself negligent so as to authorize recovery in favor of those who bungled and blundered their way into collision with it.

The evidence shows without conflict that 3542 ocean-going vessels, of which 671 were Pan American ships, had safely made the passage. Captain Spencer, who was on the Pan Maryland at the time of the collision, had made hundreds of trips through without a collision. It was established by all of the evidence that at the time of the collision the most favorable conditions existed for the passage, slack high waters, no appreciable wind, daylight, and perfect visibility.

It will not do to look for exoneration of the Pan Maryland to the pilot's explanation that the ship took an uncontrollable sheer. There is no magic in a sheer to save a navigator or his ship from the consequences of its faulty navigation either before or after it occurs. If, as the pilot testified, the ship took a sheer because the ship smelled the bottom, this would furnish no excuse for the ramming of the bridge. The condition prevailing at the time and place were of long standing, and those navigating the vessel were charged with knowledge of them and with the corresponding duty of care to prevent the ship from sheering, or, if she sheered, to take proper precaution to prevent or minimize damages likely to result therefrom.[4] The

4. The Howard Reeder, 4 Cir., 207 F. 929; The Hamilton, D.C., 212 F. 1016; Knight, Modern Seamanship, 11th Ed., p. 303; The Manhattan and The Bessem-

mere fact that a sheer occurred does not excuse a navigator unless he can show that it occurred without any fault or negligence on his own part, and that the subsequent navigation was with due care.[5]

We are convinced that if there was a sheer it was of the pilot's own making, brought about by the negligent way and manner in which he approached the draw, and the negligent maneuvering while trying to pass through, and that its consequences, instead of being met and averted by careful navigation afterward, were made more potent for harm by the plain and inexcusable negligence of the final full speed ahead order, which, flinging the ship down upon the bridge, drove her with great force and resultant damage against it.

The decree is reversed and here rendered in favor of appellant and against appellee on its cross-libel.

er, 3 F.Supp. 75, affirmed 3 Cir., 63 F.2d 995; The Sunoil [The Eagle], D.C., 8 F. Supp. 512, 1934 A.M.C. 1203.

5. The F. W. Wheeler, 6 Cir., 78 F. 824, at page 832; The Ohio, 6 Cir., 91 F. 547; Spencer on Marine Collisions, Sec. 197, p. 350; New York Transportation Co. v. O'Donnell, 2 Cir., 159 F. 659.