**SPOKANE, P. & S. RY. CO.**
v.
**THE FAIRPORT et al.**

**WATERMAN S. S. CORP.**
v.
**SPOKANE, P. & S. RY. CO.**

**WATERMAN S. S. CORP.**
v.
**SHAVER TRANSP. CO.**

Civ. A. No. 6076.

United States District Court
D. Oregon.

May 6, 1953.

Cleveland Cory and Hart, Spencer, McCulloch, Rockwood & Davies, Portland, Or., proctors for Spokane, P. & S. Ry. Co.

Thomas J. White and William F. White, Portland, Or., proctors for Shaver Transp. Co.

Francis L. Tetreault and Graham & Morse, San Francisco, Cal., proctors for Waterman S. S. Corp.

SOLOMON, District Judge.

Spokane, Portland & Seattle Railway Company (hereinafter referred to as the "SP&S") filed a libel against the Steamship Fairport and her owner, Waterman Steamship Corporation (hereinafter referred to as Waterman), to recover $6,-644.84, the damages which it sustained when the S.S. Fairport collided with its Columbia River Swing Bridge (hereinafter referred to as "the bridge").

Waterman then filed cross libels against the SP&S and Shaver Transportation Company, the owner of the tug Portland, for the damages which The Fairport sustained in such collision.

It is admitted that The Fairport, a C–2 type single screw vessel was moored portside to the dock of Terminal 1 at Vancouver, Washington, with her bow upstream. The stern of The Fairport when so moored was approximately 1,100 yards upstream from the SP&S bridge.

On the morning of June 24, 1951, the tug Portland, pursuant to a request from Waterman to assist The Fairport from its dock at Vancouver, Washington, to a dock in Portland, Oregon arrived off the starboard side of The Fairport.

At that time, it was daylight and the weather was good. There was little, if any, wind. It is admitted that no deficiency of visibility or conditions of weather contributed to the collision in question.

The Fairport was under the command of Captain J. Jacobsen and was being

piloted by Captain Ole Lee, a Waterman company pilot. Lee was properly licensed as a pilot for the Columbia River and, although he had served as either mate or master on a number of ships which were taken downstream through the bridge, this was the first time that he had ever acted as pilot on such a trip.

Prior to taking The Fairport upstream from Portland to Vancouver through the bridge, Lee went to Vancouver to observe and check conditions. He examined the United States Coast & Geodetic Survey charts of the area and checked with the District Engineer to determine the stage of the river. When he took The Fairport through the bridge opening on its trip upstream, he observed the set of the current. During the time The Fairport was docked at Vancouver, he checked prevailing conditions before determining the downstream maneuvers.

Lee testified that, in his contemplated movement from Vancouver to Portland, he intended to turn The Fairport around above the bridge and take it through the bridge opening bow first.

Captain Livingston, who, at the time of the trial, was a Columbia River pilot, was master of the tug Portland.

At the time the Portland came alongside The Fairport, Lee and Jacobsen were on the bridge of The Fairport. Lee called out his orders to Livingston. Lee testified that he told Livingston to make the Portland fast to the stern of The Fairport, to take the stern out, turn the vessel around, go through the bridge bow first, and then release the lines. Livingston asked if he should make the tug fast to the stern and, when Lee answered in the affirmative, the crew of the tug ran two wire cables from the bow of the tug to the stern of The Fairport. When the tug was made fast, Lee signalled Livingston to start pulling her out. When the stern of The Fairport was moved out, she let go her head lines and began drifting downstream in the channel. This testimony was corroborated in its essential details by Anderson, the night mate on The Fairport.

However, there is a sharp conflict between their testimony and the testimony of Waterman's witnesses on the extent of the orders given by Lee. Livingston testified that Lee ordered him to "take a line on the stern and pull the stern out." Livingston repeated this order and, when this order was confirmed, the bow of The Portland was made fast to the stern of The Fairport. Upon receiving a hand signal from Lee to take her "out and down," he began to pull the stern of The Fairport out into the river.

Livingston's testimony was corroborated by four employees of the tug: Thorndyke, Robertson, Strombaugh and May, all of whom were listening for the pilot's orders and all of whom were in a position to hear such orders. Each one of them testified that the order given was *take* or *put* "a line on the stern and pull her out," or "make fast to the stern and pull her out." Not one of them heard Lee give orders to turn The Fairport around.

After The Portland pulled The Fairport free of the dock, it continued to pull the stern out at about a 30° angle for about 2 or 3 minutes until The Fairport was in the center of the channel.

The Portland then changed the direction of her pull and continued downstream towing The Fairport stern first toward the draw opening of the bridge. When The Fairport was about 500 yards from the bridge opening, its nose began to veer starboard toward the Oregon shore. Thereafter, as the result of a sharp sheer, The Fairport was diagonally across the channel. The Portland attempted to straighten the vessel out, but, because of the manner in which it was tied to The Fairport, maneuverability was poor and neither The Fairport nor The Portland was able to prevent the starboard side of the vessel from colliding with the bridge pier.

All of the witnesses testified that it was poor seamanship to take The Fairport through the bridge opening stern first, particularly in view of the fact that the tug was made fast to the stern rather than to the bow of the vessel.

Waterman claimed that the tug Portland was negligent in that:

1. It disobeyed the express verbal orders of The Fairport to turn The Fairport around above the bridge.

2. It proceeded to tow The Fairport downstream stern first on its own initiative and without orders or signals of any kind from The Fairport.

■ I find that Lee did not order The Portland to turn The Fairport around above the bridge. Therefore, The Portland did not disobey the orders of The Fairport.

The next question is whether The Portland was guilty of negligence in towing The Fairport downstream stern first.

■■ When a tug is assisting a vessel, the tug is the servant of and is required to obey the orders of the master of the vessel. Even though the master is in command of the vessel, the pilot is his technical adviser and, when the master and the pilot are on the bridge, the pilot's orders, acquiesced in by the master, are the orders of the master. Both Jacobsen, the master, and Lee, the pilot, were on the bridge of The Fairport.

■ Livingston was under the impression that The Fairport was being piloted by Captain Johnson, an experienced Columbia River pilot, and he did not learn until after the accident that Lee was the pilot. The only orders he had received were to make the bow of his tug fast to the stern of The Fairport and pull the stern of The Fairport out and down. When The Fairport was in the center of the channel, Livingston, in order to avoid a log raft, changed his course about 15°. The channel of the river hugs the Washington bank and the draw opening of the bridge is over the channel. Livingston testified that, if he had failed to change his course and straighten The Fairport out, he would have put The Fairport in a dangerous position because it was necessary to keep the pivot end of the ship as close to the Washington side as possible.

Livingston then stalled for further orders. At that time, The Fairport was lined up with the bridge opening and Lee was within speaking distance. Lee could have communicated with Livingston either by megaphone or telephone

or he could have signalled him. In view of the original order to take the stern of The Fairport "out and down" and in view of the fact that no additional orders were forthcoming, Livingston concluded that Lee wanted him to take The Fairport through the bridge opening stern first. In my opinion, Livingston was justified in coming to this conclusion.

Even after The Fairport had reached the bridge opening (position number 5 on exhibit 14), and Lee had realized that The Fairport was in imminent danger, he could have avoided colliding with the bridge by ordering the tug to reverse its engines and tow The Fairport upstream. However, in spite of the fact that he was within speaking distance of Livingston, he failed to give him any orders from the time he left the dock until the time that The Fairport struck the bridge. Lee's only explanation for such conduct is that he did not believe that he could get cooperation from the tug.

The duties imposed upon Lee, as the pilot of The Fairport, required him to insist that the tug carry out his orders. As soon as he saw that the tug failed to undertake the maneuvers required to turn the vessel around, he should have immediately repeated such orders to make sure that the tug master fully understood them.

I therefore find that the collision between The Fairport and the bridge was solely due to the negligence of The Fairport.

Waterman contends that the faulty construction of the bridge caused or contributed to the accident. Specifically Waterman contends that the bridge was incorrectly constructed in that the draw opening has less than 200 feet clear channel way measured at right angles to the current at the stage of water which is most important to navigation. The river was at a 16-foot stage at the time of the collision and Waterman contends that at all times after the river reaches a 7-foot stage, the bridge does not comply with the statute authorizing its construction. Even though the river does not reach even the 7-foot stage during the greater part of each year, Waterman contends

that the flood stage, with its increased velocity of water and its resultant increased hazard to navigation, is "that stage of water most important to navigation." It is difficult to understand the precise manner in which Waterman contends the bridge and the piers should have been constructed in order to fully comply with the requirements of the statute.

I make no determination on the question of whether there was a technical violation of the statute authorizing the construction of the bridge because, even assuming such violation, I am of the opinion that it did not and could not have caused or contributed to the collision. I am fortified in this view by the recent case of Seaboard Airline R. Co. v. Pan American Petroleum & Transport Co., 5 Cir., 1952, 199 F.2d 761, certiorari denied 345 U.S. 909, 73 S.Ct. 649.

Libelant is therefore entitled to recover the sum of $6,644.84 plus interests and costs against the respondent. The cross libels are dismissed with costs.

Proctors for libelants and cross respondent and proctors for the impleaded respondent shall prepare findings of fact, conclusions of law, and a decree in accordance with this opinion.