### TEXAS & P. RY. CO. v. ANGOLA TRANSFER CO.*

(Circuit Court of Appeals, Fifth Circuit. March 29, 1927.)

No. 4885.

1. **Navigable waters** ⬯20(5)—Constructor of bridge according to plans approved by War Department held not liable to vessel damaged, on theory of improper construction.

Railroad company, constructing bridge according to plans and specifications approved by the Secretary of War, *held* not liable for sinking of steamboat, due to alleged improper construction of bridge, notwithstanding official approval of structure was not given until after accident.

2. **Navigable waters** ⬯20(5)—Constructor of bridge held not liable to steamboat damaged in rubbing against pier head caps during unprecedented high water.

Railroad company, constructing bridge, piers of which were mounted with steel caps three-fourths of an inch thick, which extended over the edge 4½ to 6 inches, *held* not liable to steamboat damaged in rubbing against such caps at a time of unprecedented high water, on theory of negligent failure to construct permanent bulkhead or place temporary fender around caps.

Appeal from the District Court of the United States for the Eastern District of Louisiana; Louis H. Burns, Judge.

*Rehearing denied May 23, 1927.

Libel by the Angola Transfer Company against the Texas & Pacific Railway Company. Judgment for plaintiff (14 F.[2d] 484), and defendant appeals. Reversed, and libel dismissed.

Philip S. Gidiere, of New Orleans, La. (Spencer, Gidiere, Phelps & Dunbar, of New Orleans, La., on the brief), for appellant.

John D. Grace, M. A. Grace, and Edwin H. Grace, all of New Orleans, La., for appellee.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

FOSTER, Circuit Judge. This is an appeal from a judgment awarding damages for the sinking of the steamboat Wm. Edenborn, owned by appellee, alleged to have been caused by the improper construction of a bridge over Old river, a branch of Red river, in Louisiana, owned by appellant, with which the said vessel collided. The material facts are these:

On May 5, 1912, at about 8:30 a. m., the Edenborn, with a barge loaded with a cut of railroad cars, made fast to her port side, approached the bridge from the west. The Edenborn and the barge together were about 72 feet wide, and the bridge span opening is 163 feet, giving a margin of 91 feet for passing. The Edenborn, however, went through at an angle and came in contact with the south pier of the bridge. This pier consists of two metal cylinders, 8 feet in diameter, placed close together, filled with concrete, and having steel caps three-fourths of an inch thick, extending over the sides about 4½ to 6 inches. It is shown that this construction, including the caps, is customary. At ordinary mean water these caps are about 25 feet above the surface of the river, but on the day of the accident the river was at the highest stage ever known. It had been rising at about 3 inches a day, and the water covered the caps 3 to 6 inches. The Edenborn rubbed along the edge of one of the caps, with the result that a slit was cut in her side, through which water entered her hull, causing her to sink and become a total loss.

The bridge was built by authority of Congress (Act March 3, 1901 [31 Stat. 1089]), was completed in 1903, and it is conclusively proven that it was constructed according to plans and specifications approved by the Secretary of War. In January, 1910, as the result of a public hearing in which libelant participated, respondent was required to build a guide wall 300 feet long at an angle from the south pier towards the Mississippi river on the east and to remove some obstructions from the north draw. No changes were required to be made to the bridge piers, or any other part of the structure, and guide walls were not required to the west. The guide wall ordered was built out 300 feet, but was not completed until some time after the accident; but that fact did not contribute to the sinking of the boat, as she approached from the west. After this guide wall was completed, the bridge was inspected by United States engineers and the structure was finally approved by the Secretary of War.

When in service, the Edenborn passed through the draw several times a day in each direction, and her captain, who was also the pilot, had been on her for nine months before the accident. He testifies the current was running through the draw at an angle of 45 degrees towards the east on that day at 3 to 3½ miles per hour. There is other testimony from three witnesses, who made a test, that the current ran straight through the draw at 2 miles per hour.

It is contended by appellee (1) that the construction of the bridge was initially improper, because of the projecting metal caps, and that in view of that condition a smooth bulkhead should have been built across the pier, to fend a vessel off from the cylinders in the event she should rub along the face of the pier in passing through the draw; and (2) that, in the absence of a permanent protecting bulkhead, because of the submergence of the cylinders and their caps, it was the duty of respondent to place some sort of temporary fender around the caps to serve the same purpose. Both of these theories found favor with the District Court.

[1] We are constrained to disagree with the District Court. Regarding the first contention, it is enough to say that the bridge was built by authority of Congress, according to plans and specifications approved by the Secretary of War. This afforded complete protection to appellant. It is immaterial that the final approval came after the accident, as the bridge was a lawful structure, as much before as after official approval. So. Pac. Co. v. Olympian Dredging Co., 260 U. S. 205, 43 S. Ct. 26, 67 L. Ed. 213.

[2] On the second contention, conceding arguendo that changed conditions might require protective measures, we do not think such an accident as occurred was reasonably to be anticipated, so as to require steps to be taken to prevent it. It would have been hardly possible to afford adequate protection against the sharp edges of the caps without driving pil-

ing, even if that were practicable, considering the great depth of water at the time. The superstructure of the bridge marked the opening with sufficient accuracy, and any one possessing common sense would have known that the ends of the spans rested on piers at the time under water. The situation had existed for only a day or two at most, and, as the water was then at the highest level ever known, it was probable that it would fall within a short time. There was as much danger to vessels from collision with the piers themselves as from rubbing along the caps. Undoubtedly the passage was dangerous, but the Edenborn knew the conditions and had safely made it a number of times. There was nothing to put appellant on notice that an accident was likely to happen. We think appellant was entitled to rely upon boats passing through the draw navigating carefully and keeping in the middle of the stream, or at least avoiding contact with the piers.

The judgment appealed from is reversed, and the libel is dismissed.

Reversed.