Petition of **CANAL BARGE COMPANY,** Inc., as Owner and Operator of the M/V ELAINE JONES, Praying for Exoneration from or Limitation of Liability.

No. GC 6948.

United States District Court, N. D. Mississippi, Greenville Division.

Feb. 26, 1971.

Douglas C. Wynn, Greenville, Miss., and Robert B. Acomb, Jr., New Orleans, La., for Canal Barge Co.

J. A. Lake, Frank Thackston, Jr., Greenville, Miss., and George P. Mueller, St. Louis, Mo., for St. Louis Bridge Co. and Terminal R.R.

Harry E. Barsh, Jr., Lake Charles, La., for Mrs. Griffith.

Clayton J. Swank, III, Greenville, Miss., and Elmer Price, St. Louis, Mo., for St. Louis Fuel and Supply Co., Inc. and Fort Gage, Inc., claimants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

On October 14, 1969, at approximately 12:20 p. m., a collision occurred between the M/V ELAINE JONES and the Eads Bridge, a fixed structure spanning the Mississippi River at St. Louis, Missouri, and connecting East St. Louis with the City of St. Louis. The collision resulted in damages to the bridge, the ELAINE JONES, and the death of the pilot, George L. Griffith.

Three days later—on October 17, the towboat owner and operator, Canal Barge Company, Inc. (Canal) filed in this court its petition seeking exoneration from and/or limitation of liability for the collision losses and posted ad interim stipulation (as amended) of $807,453.78 as the limitation value of the ELAINE JONES and its pending freight. Answers and claims were timely filed on behalf of (a) Mary Kathryn Griffith, administratrix of the estate of George L. Griffith, (b) St. Louis Bridge Company (Bridge Company) and Terminal Railroad Association of St. Louis (Terminal), jointly as owner and operator respectively of Eads Bridge, (c) St. Louis Fuel and Supply Company, Inc., and (d) Fort Gage, Inc. These answers not only denied that Canal was entitled to exoneration from fault in the collision but also contested its right to limit liability. The claims as propounded sought money recovery from Canal for the death of the pilot Griffith, for collision damages, including losses in revenues, to the Eads Bridge, and for the minor property damage sustained by the other two claimants. Thereupon Canal counterclaimed

against the Griffith estate asserting, in the alternative, that the deceased pilot's negligence contributed to the casualty.

An evidentiary hearing requiring seven days was concluded on December 8, 1970. After due consideration of the oral and documentary evidence the Court makes the following findings of fact and conclusions of law, to-wit:

## FINDINGS OF FACT

### BACKGROUND DATA ON M/V ELAINE JONES AND EADS BRIDGE

1. The ELAINE JONES is a twin screw, diesel-powered towboat constructed of steel with a Hydrodyne hull owned and operated by Canal. Built in 1967 by St. Louis Shipbuilding Company, it is a documented vessel of the United States bearing Official Number 506770 of 597 gross tons with a length of 154 feet, breadth 40 feet, depth 11 feet, draft 8 feet, approximately 5300 horsepower, and equipped with kort nozzles. The towboat was fully certificated by the United States Coast Guard and also by American Bureau of Shipping. At the times relevant, the vessel's equipment was completely operational; and in addition to pilot Griffith, her crew consisted of the captain, Vernon E. Stroschein, two engineers, a mate and a relief mate, two deckhands, a tankerman, and a cook. Incorporated under Louisiana law with its principal office in New Orleans, Canal owns and operates a fleet of 15 towboats as well as numerous barges on the various inland waterways.

2. The Eads Bridge is owned by St. Louis Bridge Company, which is a wholly-owned subsidiary of Terminal; and for many years the bridge has been leased to and operated by Terminal. The construction of Eads Bridge in its present location in St. Louis Harbor was completed in 1874. The bridge was constructed with three spans supported by two piers positioned in the bed of the river, one pier on the Missouri shore and one pier on the Illinois shore. The center, or channel, span of the bridge is 520 feet in width and the two supporting piers are 518 feet apart at the city directrix level, a fixed reference point based on the high-water mark for the year 1826. The east and west spans are each 502 feet in width. The bridge is an arched structure with the center of each span being the highest point above the river. The lowest point at the center of the channel span is 55.72 feet above the city directrix; this clearance reduces to 8.32 feet at the pier ends of the center span. Eads Bridge has two decks, the upper deck to accommodate motor vehicles and pedestrians and the lower deck for movement of trains. The superstructure of the bridge is below the vehicular deck level rather than above it and thus presents an arch passageway for vessels traveling through and under it. Prior to the collision in suit, the bridge had never sustained any known damage by contact with waterborne craft, nor had it been declared an unreasonable obstruction to navigation by governmental authority.

### NAVIGATION CONDITIONS IN ST. LOUIS HARBOR

3. St. Louis Harbor, the site of this accident, because of the presence of six river bridges, their close proximity and construction, coupled with the meander of the river and its currents, enjoys a reputation among river people of being a difficult area or passage to safely navigate, particularly in high water. A vessel southbound, as was the ELAINE JONES, after departing Lock 27, is first confronted with the Merchants Bridge (Mile 183), and then the McKinley Bridge (Mile 182.5), which present limited horizontal clearance. Immediately after passing the McKinley Bridge, the vessel must line up for safe passage of the Veterans Bridge (Mile 180.2) and then the Eads Bridge (Mile 180). Just downriver from the Eads Bridge are the Poplar Street Bridge (Mile 179.3) and the MacArthur Bridge, also known as the "City" bridge (Mile 179). For southbound traffic, a gradual bend in the river from left to right occurs above the

Veterans Bridge and extends to below the MacArthur Bridge. Contributing to the navigation problem is the presence of Eads Bridge which, due to its arched construction, affords a limited amount of clearance in high water through which vessels can safely pass. Also, during high water, i. e., 20 feet or more on the St. Louis gauge, the current immediately above Veterans Bridge runs from the right descending bank to the left descending bank, from the Missouri shore toward the Illinois shore. This high water current condition, called a left-hand "set" or "draft", has a pronounced effect of moving a southbound boat and tow toward the Illinois bank rather than straight ahead. These navigation conditions exist whenever the river is at 20 feet or more on the St. Louis gauge and are facts known to experienced mariners navigating towboats through that section of the Mississippi River.

4. The Veterans Bridge, which is only .2 of a mile north of Eads Bridge, is so constructed that it has but one pier situated in the river bed, which pier is substantially in line with the left descending pier of the center, or channel, span of the Eads Bridge. Thus a downbound vessel and its tow must be "shaped up" to run both the Missouri, or channel, span of the Veterans Bridge and the center, or channel, span of the Eads Bridge when the head of the tow is no closer than one-half mile above the Veterans Bridge. A vessel and its tow accomplish safe passage only when they pass under both bridges directly in line with the green navigational lights affixed to the center spans of each structure.

5. The river at St. Louis Harbor reaches flood stage at 30 feet, a condition which periodically occurs. On October 14, the date of the collision, the river stage was 30.3 feet; this flood stage was the result of a sudden and unexpected rise of an unprecedented rapidity occasioned by heavy rainfall. For example, harbor gauge readings for the 5-day period were as follows:

| October 10 | 3.2 feet |
| October 11 | 5.2 feet |
| October 12 | 14.1 feet |
| October 13 | 25.8 feet |
| October 14 | 30.3 feet |

As the river stage exceeds 20 feet, the force of the aforementioned set to the left above Veterans Bridge likewise increases; and also as the rate of rise in the river accelerates, the force of the set becomes more violent. Although a sudden rise of the river increases the severity of the set, this is an operating factor known to persons experienced in navigating St. Louis Harbor during high water. Moreover, the experienced navigator of a downbound vessel can reasonably predict the severity of current in St. Louis Harbor by observing upriver conditions at Wood River, Illinois, and water levels at Lock 27.

6. The above left set or cross-current is not encountered by downbound vessels except in high water. At all other times the current in the immediate area runs straight down the river. When navigating the harbor downbound in low water (10 feet or less), it is an acceptable practice for a vessel to approach the Veterans and Eads Bridges in line with their green lights and pass under both along the mid-channel sailing line, as depicted on the U. S. Engineers' official chart (Ex. 13). See App. A. This sailing line is the normal low water configuration for passage of a descending vessel. When navigating the harbor downbound in high water, it is the commonly accepted practice, in order to compensate for the left hand set encountered just above Veterans Bridge, to approach Veterans Bridge well to the right of the mid-channel sailing line, or favoring the Missouri shore. By this means, the vessel and tow are not forced by the cross-current to the left of the mid-channel sailing line, as it runs immediately beneath both the Veterans and Eads Bridges. Thus, a downbound vessel and tow that in high water approach the Veterans and Eads Bridges within one-quarter of a mile north of Veterans Bridge on the mid-channel sailing line are too wide or "out of shape" to safely navigate the passage beneath the two bridges.

## THE VOYAGE OF THE ELAINE JONES PRIOR TO ACCIDENT

7. On September 29, 1969, Vernon Stroschein was assigned as pilot aboard the ELAINE JONES, relieving her regular captain. On October 7, George Griffith boarded the vessel at Memphis, relieving the regular relief captain. Stroschein became the captain and stood watch from 6 a. m. to noon and 6 p. m. to midnight; Griffith became the pilot, standing watch from noon to 6 p. m. and midnight to 6 a. m. While both Stroschein and Griffith were Canal's regularly employed wheelhouse personnel, this was the first time that either had ever served aboard the ELAINE JONES. On October 9, the ELAINE JONES passed northbound through the St. Louis Harbor when the river gauge was 4.7 feet. Continuing north, the vessel went through Lock 27 (Mile 185), which is approximately five miles north of the Eads Bridge, and also through Lock 26 (Mile 203), before entering the Illinois River.

8. On October 12 the ELAINE JONES exchanged her tow with Canal's M/V LEONIDAS POLK at approximately 10:25 a. m. at Mile Post 261 on the Illinois River. This tow exchange was a customary procedure for Canal, which operates integrated tows by utilizing its power vessels where most needed. At this exchange the ELAINE JONES picked up seven empty barges from the LEONIDAS POLK. Following the exchange, Griffith stood his regular watch on October 13 from noon to 6 p. m., and he again assumed control on his regular watch from midnight October 13 to 6 a. m. October 14.

9. The ELAINE JONES then proceeded downriver with the seven empty barges, arriving at Wood River, Illinois, at approximately 5:40 a. m. on October 14. At Wood River, which is about 20 miles upriver from St. Louis, the ELAINE JONES added three barges to the seven empties already in tow, two of the added barges, NBC-883 and S-1,

being loaded. The tow of ten barges, as rearranged, was made up two wide and five long, with the two loaded barges being the aft-most two barges in the port string. The towboat was made up astern the NBC-883, the port stern barge in the tow. The flotilla was 100 feet wide, 1050 feet long on the port string and 900 feet long on the starboard string, which was a normal and customary arrangement. The same morning the ELAINE JONES departed Wood River at 9:45 a. m. enroute to Lock 27 with Captain Stroschein at the controls. At 11:25 a. m. it arrived at Lock 27, from which it departed at 11:50 a. m.

10. During the ELAINE JONES' southbound voyage from Wood River to Lock 27, Captain Stroschein and Pilot Griffith were aware that the river at St. Louis Harbor was at flood stage and that it had risen at an extraordinarily rapid rate during the preceding several days. River information was readily available to them at the locks and also by radio with other vessels operating in the immediate area.

11. Canal maintains a shore facility at Natchez, Mississippi, which has twice-daily radio contact with its various vessels, including the ELAINE JONES. Discussions regularly take place between operating wheelhouse personnel and Canal's marine superintendent and port captain. During the period October 11–14 when the ELAINE JONES was operating just above St. Louis Harbor, several other Canal vessels, in daily radio communication with Canal's supervisory personnel at Natchez, were also in the vicinity of the St. Louis Harbor. Prior to the time of the collision, Canal's port captain, Earl Daily, was aware of the flood stage at St. Louis Harbor and the unusual rise in the river in that area.

12. At 11:45 a. m., just prior to departing Lock 27, Pilot Griffith came on watch to relieve Captain Stroschein. While employed by Canal, Griffith had never piloted any of its vessels southbound through St. Louis Harbor at flood stage or even in high water. Stroschein, however, had encountered the left set

just above the Veterans Bridge in his previous experience, but did not communicate this information to Griffith, nor did he issue any instructions to the pilot for navigating the harbor under the known conditions. After briefly discussing with the pilot the tendency of the tow to have a starboard drag, Captain Stroschein left the wheelhouse and went to the galley for his noon meal.

### APPROACH TO BRIDGES AND COLLISION

13. At 12:10 p. m. Captain Stroschein returned to the wheelhouse and noted that the tow had already passed the Merchants and McKinley Bridges and the head of the tow was approximately halfway between the McKinley Bridge (Mile 182.5) and the Veterans Bridge (Mile 180.2), or in excess of one mile above the Veterans Bridge (point x on Ex. 13). At this moment the ELAINE JONES and her tow were lined up with the green lights of the center span of the Veterans Bridge, which lights are aligned, or nearly so, with the navigation lights on the Eads Bridge; with this heading both the vessel and her tow were lined up on the mid-channel sailing line. Observing this condition, Captain Stroschein made no criticism or comment to Pilot Griffith upon the manner in which he was making his approach to the bridges. The captain neither informed Griffith of the left set to be encountered ahead, nor assumed command of the vessel. From about one-half mile north of Veterans Bridge, Griffith made a downbound approach too wide to safely navigate the bridges ahead. Pilot Griffith continued on the mid-channel sailing line until the head of the tow reached about one-quarter mile north of Veterans Bridge (point y on Ex. 13), where the head of the tow and the stern of the vessel were still lined up with the green lights on the Veterans and Eads Bridges. At this point the left hand set in the river was encountered, causing the vessel and her entire tow to slide or be pushed violently to the left and off the mid-channel sailing line. The new heading of the flotilla, which was then moving full speed ahead and at an overland rate of about 12 mph, was away from the center span of the Eads Bridge and toward the river (or left descending channel) pier of the Veterans Bridge. It was only when the vessel was about 100 feet above the Veterans Bridge that Captain Stroschein, according to his testimony, first became alarmed.

14. In an attempt to overcome the set to port, Pilot Griffith steered hard to starboard, which moved the head of the tow to the Missouri shore and caused the stern of the vessel to swing in the opposite direction, or toward the Illinois shore. As the vessel neared the river pier of the Veterans Bridge, the pilot then steered to port in an attempt to swing the ELAINE JONES to the right toward the middle of the channel. The pilot's efforts to regain a safe course were unsuccessful, for the port side of the ELAINE JONES, about 20 feet forward of her stern, bumped against the river pier of the Veterans Bridge. At this point the head of the tow was almost at the Eads Bridge and the vessel's wheelhouse, including radar equipment, was about 44 feet above the water line.

15. Immediately following the towboat's striking the Veterans Bridge pier, the port face wires parted, the tow went out of control and jackknifed with its head swinging toward the Missouri shore at a 45° angle to the mid-sailing line; but the tow remained fixed to the vessel by the starboard wires. The pilot, realizing that a collision was imminent with the left descending pier of the center span of the Eads Bridge, shifted the vessel's engines from full ahead to full astern, to prevent the vessel from colliding directly with the left descending pier of the Eads Bridge. Captain Stroschein, who had remained in the wheelhouse, realized at once that the tow was out of control and would probably collide with the left descending pier of the Eads Bridge if the engines were not reversed, as the pilot was then doing. Stroschein soon realized, however, that

even if the engines were reversed, some portion of the tow or vessel would inevitably collide with the Eads Bridge. Consequently, the captain abandoned the wheelhouse, leaving the pilot Griffith behind to maneuver the vessel off the left descending pier of the Eads Bridge toward which it was rapidly moving.

16. Only seconds thereafter the wheelhouse struck the bottom portion of the Eads Bridge arch at a point about 50 feet west of the left descending pier and 20 feet above the city directrix level. As a result of this collision, the wheelhouse of the ELAINE JONES was demolished and a section or chord of the bridge knocked out. Immediately prior to the impact, Pilot Griffith left the wheelhouse, but it was then too late, for he was crushed by falling metal and instantly killed. Not more than a minute elapsed between the time the ELAINE JONES rubbed the Veterans pier and the time its wheelhouse was demolished by striking the arch of the Eads Bridge.

17. The ELAINE JONES could have safely navigated the Veterans and Eads Bridges had her downriver approach been closer to the Missouri shore so as to compensate for the left hand set encountered just above the Veterans Bridge, which set was predictable when the St. Louis gauge stood at flood stage. On the day before and on the day of the accident, various other downbound towboats of the same and lesser horsepower and size tow encountered the same current conditions, and they safely navigated the St. Louis Harbor.

## COMPETENCY OF WHEELHOUSE PERSONNEL

18. Captain Stroschein, age 36, was initially employed by Canal in 1958. After serving as tankerman and mate, he had several years' experience piloting six of Canal's towboats. Although he had served as pilot on both the M/V EUGENIA P. JONES and the M/V LEONIDAS POLK, 4300 horsepower each, his regular employment was as master of the M/V CAROLINE, an 1800 horse-power vessel. When he boarded the ELAINE JONES on September 29, 1969, it was Stroschein's first trip on that towboat, and he shared watches with the vessel's master, Captain Lay, until the latter debarked at Memphis on October 7, when Griffith came aboard to act as his pilot and stand the after watch. Stroschein had had no prior service with Griffith on any of Canal's vessels. At Wood River, Illinois, the captain was on watch when the tow was made up, and Griffith did not participate in its arrangement. The captain decided to navigate to St. Louis and on his watch, enroute to Lock 27 at slow speed, he did not encounter any abnormal movement of the tow. When taking the controls in the lock at 11:45, Griffith asked the captain about the possibility of a starboard drag because of the tow's makeup. The captain then advised him that if such a drag developed at full speed, Griffith should make a port steer to compensate for it but that it was up to him, the pilot, to decide how much steer was in order after getting the feel of the tow. Captain Stroschein knew that it would take Griffith, who was generally familiar with the barges and the tow, a period of some minutes, after the ELAINE JONES got under way at full speed ahead, to make this determination. From his prior experience Captain Stroschein was aware that a left set just above the Veterans Bridge might be encountered in extremely high water and the force of the cross-current could slide a tow toward the Illinois shore. He also knew that a downbound vessel and her tow had to be shaped up for safe passage beneath the Veterans and Eads Bridges at least one-half mile north of Veterans Bridge; and he further knew if at that point the flotilla was too far from the Missouri shore, navigation ahead would be imperiled by the limited clearance afforded by the arches of the Eads Bridge in high water, which necessitated passage directly under the middle of the center span of Eads Bridge.

19. George Griffith, 47 years of age, was first employed by Canal in January

1968 after seven years' experience piloting vessels of other towing companies on various rivers, including the Mississippi River. He was regularly assigned as pilot to the M/V JOSEPH M. JONES, a 4300 horsepower vessel which was a sister ship of the ELAINE JONES, both having the same dimensions. Griffith had also piloted five other Canal towboats, including the LEONIDAS POLK. He had piloted the JOSEPH M. JONES southbound through the St. Louis Harbor on at least four different trips: September 13, October 27, November 14, 1968, and July 23, 1969, and was off watch on a fifth trip, March 4, 1969. The evidence does not reveal that on any of these occasions high water conditions existed at the St. Louis Harbor. When taking the controls from Captain Stroschein at Lock 27, Griffith knew of the high water condition at St. Louis Harbor, that Eads Bridge had only limited clearance, making it necessary to pass beneath the center of the Eads channel span, but he did not know of a left hand set to be encountered directly above the Veterans Bridge, nor was he apprised of its probable existence by Captain Stroschein or Canal's other supervisory personnel. Moreover, when he assumed control at Lock 27, Griffith had inadequate time to get the feel of the tow or otherwise check its steerage before getting too wide in the navigation course, and without warning he held to that course until the set slid the flotilla to port. Griffith then attempted to correct the course by steering first to starboard and then to port to avoid striking the Veterans pier. Out of shape for navigating Eads Bridge, the pilot's maneuvers to extricate the vessel and tow from their plight were procedures that an experienced mariner would resort to in such an emergency.

20. Earl Daily, Canal's shore-based port captain, assigned Stroschein and Griffith to their respective positions on the ELAINE JONES. Familiar with the capabilities and records of both men, he knew that they had neither crewed together nor had prior service on the ELAINE JONES. A veteran river pilot himself, Captain Daily also knew that whenever the river stage at St. Louis Harbor exceeded 22 feet, the left set above the Veterans Bridge should be expected and, given that condition, a vessel descending too wide from the Missouri shore would have trouble shaping up to run the bridges. Although Captain Daily was in twice-daily communication with the ELAINE JONES and was fully aware of her movements, he issued no particular instructions to Stroschein or Griffith for navigating the harbor. Canal, through its port captain, was privy to the perils of the navigation.

## DAMAGES CAUSED BY COLLISION

### *Death Claim of the Administratrix.*

21. At the time of his death, George Griffith had been married to Mary Kathryn Griffith since September 10, 1945, and they had lived together until his death. The widow is 46 years of age, in good health and has a life expectancy of 33.2 years. Four children were born of their marriage, namely: Sharon Ann, on June 20, 1946; Guy Rocklyn, on January 13, 1948; Dixie Lea, on January 29, 1953; and Dusty Lane, on September 17, 1954. Decedent resided in Timbo, Arkansas, sharing his household with his wife, their 15 year-old son, Dusty Lane, and their 22 year-old daughter, Sharon Ann, and her small child. The adult daughter, Sharon Ann Griffith Robique, worked at a shirt factory and received an allotment from her estranged husband, who was in the military service, but she and her small child were furnished food and lodging by Griffith. The other two children, Guy Rocklyn and Dixie Lea, were married, self-supporting, and maintained their own households elsewhere.

22. His death being instantaneous, Griffith had no conscious pain and suffering, and his funeral expenses of $3,000 have been paid by Canal.

21. At the time of his death, Griffith was in good health and had a work-life expectancy of 16.4 years from date of

trial. Griffith had a stable and regular employment as a river pilot, and the last year of his life his earnings, projected over a 12-month period, amounted to $11,321. His loss of wages accrued to date of trial is $12,376. Decedent's future loss of income is to be calculated at $11,321 per year for his 16.4 years' work-life expectancy, and discounted at a reasonable rate of 4%; this sum amounts to $134,240. Griffith might have reasonably anticipated certain increases in his future earnings; such increases may fairly be calculated at the rate of 2% per year to the end of his work-life expectancy, which is to be also discounted at 4%. Thus an additional loss of future income is derived in the sum of $20,522.

22. 25% of his income, or about $250 monthly, was used by decedent for his personal needs and purposes, and that percentage is a fair and reasonable apportionment of Griffith's total income attributable to his personal use had he survived.

23. The pecuniary loss to Mary Kathryn Griffith, widow, and Dusty Lane Griffith and Sharon Ann Griffith Robique, dependent children, is as follows:

| | |
|---|---:|
| Loss of wages to date of trial | $ 12,376 |
| Future loss of Income | 134,240 |
| Future loss of Increased earnings | 20,522 |
| | 167,138 |
| Less 25% attributable to decedent's personal use | 41,784 |
| Total allowable loss | 125,354 |
| Distributable as follows: | |
| Mary Kathryn Griffith | 89,354 |
| Dusty Lane Griffith (6 years during minority at $250 monthly) | 18,000 |
| Sharon Ann Griffith Robique (10 years at $150 monthly) | 18,000 |

24. Griffith provided the guidance, care and discipline of a good father to Dusty Lane Griffith, the only minor child residing in the household. By reason of his father's death, this minor child has sustained, and during his minority will continue to sustain, further loss from the lack of his father's care, guidance and discipline. This item of damage is assessed at the rate of $1,200 per year for six years, or $7,200.

25. The above enumerated elements constitute the damages allowable to the administratrix in this action. If the applicable law authorized an award of general damages, the court, in such case, would find that the decedent and his wife were happily married for many years, and close and affectionate ties existed between him and his four children. Each member of his surviving family has sustained loss from being deprived of his love and affection, companionship and society, fixed as follows:

| | |
|---|---:|
| Mary Kathryn Griffith | $20,000 |
| Sharon Ann Griffith Robique | 10,000 |
| Guy Rocklyn Griffith | 10,000 |
| Dixie Lea Griffith | 10,000 |
| Dusty Lane Griffith | 10,000 |

making a total of $60,000 general damages.

## THE JOINT CLAIMS OF BRIDGE COMPANY AND TERMINAL FOR PROPERTY DAMAGE AND REVENUE LOSSES.

26. Immediately following the collision, Terminal closed Eads Bridge to both vehicular and rail traffic. Two days later, two of the four vehicular lanes were reopened allowing highway traffic in both directions. Rail traffic was not resumed until all bridge damage had been repaired. On June 15, 1970, all traffic, both rail and vehicular, returned to normal.

27. After having its own personnel inspect the bridge's structural damage, Terminal engaged Sverdrup and Parcel, a firm of consulting engineers, to perform the necessary engineering services and contracted with American Bridge, Division of U. S. Steel, to fabricate the needed repair components. The process of bridge repair was complex, requiring the jacking of the entire structure to insert missing parts, but the work was performed with dispatch. The work done under these contractual arrangements was necessary to restore the bridge to its condition immediately preceding the accident. The repairs made neither enhanced the bridge's value nor extended its useful life.

28. The entire cost of the original bridge structure, because of its age, had been fully depreciated on Terminal's books in accordance with depreciation rates prescribed by the Interstate Commerce Commission. At the time of the collision, however, the bridge was in sound condition and had a remaining useful life for an indefinite number of years. The actual value of the bridge is very substantial, Terminal having declined in recent years various offers to purchase the bridge at cash offers ranging from $11 million to $15 million, plus other considerations. Eads Bridge is of very great value to Terminal because it constitutes an integral part of its business operations, and is important to the needs of various proprietary railroad companies which own 100% of Terminal's stock.

29. Terminal paid Sverdrup and Parcel $50,822.58 for their engineering service, and American Bridge $191,772.57 for its work. These charges were fair and reasonable in amount and constituted service and work necessarily incurred because of collision damage. Terminal also incurred reasonable expenses of $10,-592.61, itemized in the evidence, for miscellaneous items connected with the collision damage. The total amount of structural and incidental damage to the Eads Bridge exclusive of revenue loss, which proximately resulted from the collision, is determined to be the sum of $253,187.76.

30. Terminal is a switching or terminal line railroad which serves, although in a different manner, both freight and passenger trains of certain operating railroads arriving and departing the St. Louis area. Basically Terminal's service function is to move its customers' rail cars and engines across the Mississippi River in accordance with established routing procedures. Besides the Eads Bridge, Terminal owns the Merchants Bridge, which is located three miles upriver, rail trackage and yards on both sides of the river at St. Louis, and Union Station, the St. Louis passenger terminal. In its normal operations, Terminal regularly uses not only its Eads and Merchants Bridges but also the MacArthur Bridge owned by the City of St. Louis, which charges Terminal tolls for all crossings over it. The MacArthur Bridge is located immediately downriver from and convenient to Eads Bridge. During the 8-month period of bridge repair, Terminal, in its use of MacArthur Bridge, incurred additional expenses in city bridge tolls and from furnishing to passenger trains qualified pilots or switchmen as required by the City. In addition to certain increased operating costs, Terminal sustained a direct loss of revenue for charges it would otherwise make to its own railroad customers for crossing Eads Bridge. The nature of the services and the amount of charges made by Terminal differ for freight trains and passenger trains, and it is necessary to determine the losses of each category.

31. Terminal receives freight cars from railroad customers in its various classification yards situated in or near St. Louis on both sides of the river and it arranges such cars according to size and destination. Once classified, incoming freight cars are delivered by Terminal's own engines and crews. Terminal's trans-river freight movements originate from various classification yards, principally Central District (C. D.) and Madison Yards, which are on the Illinois side, and several classification yards, chiefly Mill Creek Valley, situated in Missouri. C. D. Yard is located near Eads Bridge, and directly west of Eads Bridge is Mill Creek Valley, which is in downtown St. Louis. C. D. has always primarily served the trans-river freight entering St. Louis from the east for delivery to Mill Creek Valley, and Eads Bridge is the shortest and most convenient route from C. D. to Mill Creek Valley. The nearby city-owned MacArthur Bridge, to which C. D. Yard also has easy access, is the next shortest and most convenient route for traffic moving between C. D. and Mill Creek Valley. The other principal eastside yard, Madison, is located several miles north of Eads

Bridge and close to Merchants Bridge, and trans-river traffic originating in that yard, which is of great volume, is sent across Merchants Bridge. The bulk of the freight traffic in the St. Louis area moves westwardly, from Illinois to Missouri.

32. The railroad deck of the Eads Bridge leads into a tunnel on the west side of the river which somewhat restricts its use by oversize or jumbo freight cars and larger locomotives. When oversize freight cars westbound are received in C. D. Yard, they are moved across Merchants Bridge or MacArthur Bridge, depending upon destination and traffic conditions. Since Terminal had to pay tolls for using the MacArthur Bridge, Terminal had standing instructions to its personnel to use Merchants Bridge as much as possible. On many occasions, however, Terminal, in the course of ordinary operations, chose to move larger freight cars over the MacArthur Bridge when there existed traffic congestion from C. D. to Merchants Bridge or other trackage considerations. Long prior to the Eads Bridge damage, Terminal made frequent use of the MacArthur Bridge for certain C. D. westbound freight traffic, and the volume of jumbo freight cars has actually increased for the last decade or more. A considerable portion of Terminal's trackage and switching facilities in the eastside yards is primarily employed to handle non-river moves between C. D., Madison, and other yards and serve Illinois-based industrial establishments. When the Eads Bridge was shut down, Terminal's eastside trackage and rail facilities were inadequate to meet the requirements of its non-river business and also move all its freight volume across the river via Merchants Bridge. Of necessity, Terminal was forced to use the MacArthur Bridge in order to maintain an orderly operation.

33. Terminal maintained a three-bridge daily report showing its use of the Eads, Merchants and MacArthur Bridges, and prior to October 14, 1968, Terminal's actual use of the Eads Bridge

for freight traffic was substantial. For example, between October 15, 1968 through June 15, 1969, the identical period one-year preceding the bridge closing, Terminal sent across Eads 1203 loaded freight engines, 21,496 loaded freight cars and 9187 empty freight cars; and for the 8-month period immediately preceding its closing, Eads was crossed by 1541 loaded freight engines, 26,083 loaded freight cars and 12,658 freight empties. During the month Eads Bridge was closed, 1214 loaded freight engines, 20,499 loaded freight cars and 10,032 empty freight cars would, except for the shutdown, have been sent across Eads Bridge and were, necessarily and in the course of orderly operations, sent across the MacArthur Bridge. Each day Eads movements were physically classified in the yards and designated as such on Terminal's basic records. From an operating standpoint, it was neither practicable nor economically feasible for Merchants Bridge to handle this additional volume.

34. For its freight car service of classifying, hauling and delivery, Terminal charged its customers a fixed tariff of approximately $33 per car and it might elect which bridge to use for the river crossing. When MacArthur Bridge was used, the City tolls were absorbed by Terminal and not passed on to its customers. These City tolls during the period in issue were $4.84 per engine (loaded or light), $2.32 per loaded freight car, and $1.21 per excess (of those moving in opposite direction) empty freight car. Hence, while Eads Bridge was closed, Terminal incurred City toll charges for Eads movements as follows:

| | |
|---|---:|
| 1,214 loaded engines at $4.84 | $ 5,875.76 |
| 20,499 loaded freight cars at $2.32 | 49,607.58 |
| 5,108 excess empties at $1.21 | 6,180.68 |
| Total | $61,664.02 |

Terminal's records are sufficiently definite to support the foregoing element of loss, which is supported by Terminal's operating experience prior to the closing of Eads Bridge. Tolls paid for 1594 light engines, or those without cars, are dis-

allowed because that number represented all light engines crossing MacArthur Bridge and Terminal failed to establish how many light engines were attributable to Eads traffic. Terminal's use of locomotives prohibited on the Eads Bridge but not on the MacArthur Bridge, however, does not detract from the validity of this portion of the claim since the undisputed evidence shows that freight cars classified for an Eads Bridge crossing were then moved by the most available engine. Terminal's claim for reimbursement of freight tolls paid to the City does not include any movements which could have practicably used the Merchants Bridge.

35. As regards passenger service, three passenger lines, viz: the L & N, the B & O, and Penn Central, customarily crossed the Mississippi River via Eads Bridge, entered and departed from Union Station, where they discharged and took on passengers and mail. The Eads Bridge was used by these passenger lines which operated on a regularly scheduled basis as the shortest and most direct route into Union Station, which is in Mill Creek Valley area, and also because bridge tolls charged by Terminal for Eads crossing were substantially less than the City's passenger tolls for MacArthur Bridge. In crossing Eads Bridge, passenger trains, unlike freight trains, continue to be operated by their own crews and powered by their own engines. During the period in issue, the City charged tolls of $4.84 per passenger locomotive and $3.63 per passenger car. Terminal's toll charges were substantially less, namely, $2.40 per passenger engine and $1.80 per passenger car, applicable to both Eads and Merchants Bridges. Besides the difference in toll rates, the City required a qualified pilot, or switchman, aboard passenger trains crossing the MacArthur Bridge, another item of expense not to be incurred if Terminal used its own bridge. Prior to the closing of the Eads Bridge, these passenger lines rarely crossed the river by either the MacArthur Bridge or the Merchants Bridge. The distance for the three passenger lines into Union Station via Merchants Bridge was approximately three times greater than that from Eads or MacArthur Bridges. Because of their fixed schedule requirements, the passenger lines could not feasibly use Merchants Bridge during the time Eads Bridge was out of order, which made it imperative that Terminal use the MacArthur Bridge.

36. By long-standing custom and mutual interpretation of its operating agreement with the proprietary lines, Terminal would absorb the higher operating costs resulting from City bridge tolls and qualified pilot expense when the MacArthur Bridge was used due to unavailability of, or interruption in, Terminal's crossing facilities; in such case the extra charges would not be passed on to the proprietary lines. Also by long-standing custom and interpretation of their operating agreement, the proprietary lines would pay the full City bridge toll and other expense where the MacArthur Bridge had to be used despite the availability of Eads Bridge, as with larger locomotives or oversize cars.

37. During the time that the Eads Bridge was closed, a total of 3952 passenger engines and 9970 passenger cars crossed the river via MacArthur Bridge; these engines and cars would have used Eads Bridge had it been available. Terminal incurred City bridge tolls of $55,318.78, consisting of $19,127.68 for 3952 passenger engines (at $4.84) and $36,191.10 for 9970 passenger cars (at $3.63). Terminal also incurred expenses of $42,560.49 paid as wages to pilots required by the City for the MacArthur Bridge and employees' fringe benefits of $13,074.58, making a total outlay of $55,635.07 incurred by Terminal for this special purpose. Taxi fares paid for these pilots were shown, by reasonable estimate, to have increased $586.04 per month, or $4,688.32 for 8 months that the Eads Bridge was closed.

38. Terminal did not pass on to the three passenger lines any charges for pilot services, including taxi fares; yet because of cash shortages due to bridge

repair payments, losses in operating revenue, and other increased expenses, Terminal billed the three passenger lines at the City bridge rate of $4.84 per engine and $3.63 per car, rather than at the lower Eads rate. The passenger lines paid these bills under protest and with Terminal's promise of future adjustment by reimbursing them for the difference of $27,887.98 in the bridge tolls. Terminal, on the basis of its agreement and custom, is obligated to reimburse the passenger lines for their advance since use of the MacArthur Bridge was necessitated by the Eads collision damage, and not by any act of the passenger lines.

39. In addition to incurring the obligation to reimburse its passenger-line customers $27,887.98 for overpayment, Terminal lost revenue for the passenger engines and cars which could not cross Eads Bridge during the Eads Bridge shutdown. It lost $2.40 for each passenger engine and $1.80 for each passenger car forced to use the MacArthur Bridge. Thus, for the 3952 passenger engines, Terminal sustained a revenue loss of $9,484.80 and for 9970 passenger cars a loss of $17,946.00, making its total passenger revenue loss $27,430.80.

40. Terminal's claim of damage for expense and loss of revenue in connection with its passenger traffic is recapitulated as follows:

| | |
|---|---|
| Amount Terminal is obligated to reimburse passenger lines being charged the difference between toll rates on Eads and MacArthur Bridges | $ 27,887.98 |
| Amounts paid to pilots (including fringe benefits) furnished by Terminal to passenger lines customers for their trains to use MacArthur Bridge | 55,635.07 |
| Taxi fares to transport pilots back and forth across river | 4,688.32 |
| Loss in tolls for passenger engines and cars unable to use Eads Bridge | 27,430.80 |
| Total | $115,642.17 |

41. Terminal originally contended it sustained a loss of $146,779.40 in decreased vehicular tolls but at time of trial reduced its claimed loss to $43,193.62. The Eads vehicular deck was not the only crossing for highway traffic, but it competed with Interstate 70—Poplar Street Bridge, which was an 8-lane toll-free bridge 12 blocks south, and the previously mentioned Veterans Bridge, a 4-lane toll bridge, 2 blocks north of Eads. After the free Poplar Street Bridge opened in November 1967, the Eads vehicular revenue sharply decreased each month, and this revenue trend continued downward although in October 1968 the Eads tolls were raised from 15¢ to 25¢ per car. The Veterans car rate, however, remained at 15¢. Over the two-year period prior to the collision, the Eads vehicular traffic declined 60%, or from 900,000 to 350,000 cars monthly. From mid-October 1969 to mid-April 1970, 50,000 fewer cars monthly crossed Eads Bridge than for the same period the previous year. On April 21, 1970, down ramps on the free bridge directly into East St. Louis were opened. When this event occurred, the Eads traffic decreased another 100,000 cars monthly over the same months of the previous year. After the Eads Bridge reopened with four lanes in use, its traffic volume remained at this reduced level. Once the down ramps on the free bridge were opened, reduction in Eads traffic was attributable to the new facility which was of great convenience to commuters and not due to the restriction of Eads to only two lane traffic. Accordingly, Terminal's claim must be confined to the first six months of the period of bridge repair. During that time Eads' vehicular receipts were about 17% below those of the identical period for the prior year. Except for the bridge accident, this difference in receipts would not have exceeded 9.14%, upon the basis of 4-weeks operating experience immediately prior to the collision. It is reasonable to attribute the remainder of the revenue loss, or 7.82% to the restricted operation of the vehicular deck due to the collision. To this extent, Terminal has established an allowable revenue loss in vehicular tolls of $32,943.84.

### Property Damage Sustained by Other Claimants

42. St. Louis Fuel & Supply Company, Inc., the owner of WB St. Louis

Fuel Boat and Barge 425, sustained property damage of $998.18 when its aforesaid craft were struck by a barge of the runaway tow of the M/V ELAINE JONES.

43. Fort Gage, Inc., owner of the M/V FORT GAGE, sustained property damage of $1,625.00 to its said vessel when it was struck by the same runaway barge.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of this proceeding for limitation of shipowner's liability pursuant to 46 U.S.C. § 183 et seq.

2. The defense of inevitable accident is available to a shipowner not only in case of an act of God but also where all reasonably required precautions have been taken, and the accident nevertheless occurs. Atkins v. Lorentzen, 328 F.2d 66 (5 Cir. 1964); The Olympia, 61 F. 120 (6 Cir. 1894). To avail itself of that defense, Canal must carry the heavy burden of proving all necessary elements by exhausting "every reasonable possibility which the circumstances admit and show that in each [it] did all that reasonable care required." Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Oil Co., 377 F.2d 724 (5 Cir. 1967); Boudoin v. J. Ray McDermott & Co., 281 F.2d 81 (5 Cir. 1960); Union Steamship Co. v. N. Y. & Va. Steamship Co., 65 U.S. 307, 16 L.Ed. 699 (1860).

3. Where a moving vessel collides with a fixed object, there is a presumption that the moving vessel is at fault. In the absence of adequate proof to rebut it, this presumption would suffice to make a prima facie case of fault against the M/V ELAINE JONES. The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895); The Victor, 153 F.2d 200 (5 Cir. 1946); Brown & Root Marine Operators, supra.

4. Canal may not exonerate the vessel merely by showing that the pilot exercised good seamanship after the danger of a collision arose, but it must also demonstrate that the pilot was in no way at fault in placing the vessel in a position where danger would probably be encountered. Boudoin, supra; The Old Reliable, 269 F. 725 (3 Cir. 1921). Otherwise stated, it is not an inevitable accident where a master proceeds carelessly on his voyage and afterwards perilous circumstances arise, when it is too late for him to avoid the accident. The master must show that he acted seasonably, that he did everything that an experienced mariner could do, adopting ordinary caution, and that the collision ensued in spite of such exertions. Union Steamship Co., supra.

5. The master of the ELAINE JONES is chargeable with knowledge of all navigational conditions reasonably ascertainable by mariners experienced in navigating St. Louis Harbor during flood stage, and even if its pilot, George Griffith, did not actually know that there existed a left set above Veterans Bridge, his ignorance may not relieve Canal of fault in the collision. Davidson Steamship Co. v. United States, 205 U.S. 187, 27 S.Ct. 480, 51 L.Ed. 764 (1906); Boudoin, supra.

6. The fact that other vessels safely navigated St. Louis Harbor under like conditions is evidence that the ELAINE JONES and her master did not take all steps reasonably required to avoid colliding with the bridges. Seaboard Airline R. Co. v. Pan American Petroleum & Transport Co., 199 F.2d 761 (5 Cir. 1952); The William E. Reis, 152 F. 673 (6 Cir. 1907).

7. Applying the foregoing rules of law to the facts of this case, the court concludes that the collision between the ELAINE JONES and the Eads Bridge was not an inevitable accident but was due to the fault of the vessel, and Canal is not entitled to exoneration.

8. Canal, through its port captain, had privity or knowledge of the navigational hazards in St. Louis Harbor; and its failure to inform the master and pilot of the ELAINE JONES of such hazards was a negligent omission

which proximately contributed to the collision. Continental Ins. Co. v. Sabine Towing Co., 117 F.2d 694 (5 Cir. 1941). The granting or denying of relief by way of limitation, however, is moot by reason of the fact that the stipulated value of the vessel and freight exceeds the aggregate of all allowable claims.

9. Vernon E. Stroschein, master of the ELAINE JONES, was negligent as follows:

(a) In tendering to his pilot a tow without affording him an opportunity to get the feel of the tow before encountering unusual river conditions which the master knew were hazardous to navigate;

(b) In failing to inform his pilot of a hazard to navigation of which he had knowledge. Davis v. Parkhill-Goodloe Co., 302 F.2d 489 (5 Cir. 1962); Pioneer S. S. Co. v. Hill, 227 F.2d 262 (6 Cir. 1955); Sylve v. E. W. Gravolet Canning Co., Inc., 278 F.Supp. 669 (E.D.La.1967);

(c) In failing to instruct his pilot as to the proper method of navigating St. Louis Harbor under known hazardous conditions. Davis v. Parkhill-Fruit Co., 272 F.2d 347 (2 Cir. 1959); Goodloe Co., supra; Martin v. United

(d) In failing to take charge when the pilot plainly misgoverned the vessel. Union Shipping & Trading Co. v. U. S., 127 F.2d 771 (2 Cir. 1942); and

(e) In abandoning the wheelhouse of the ELAINE JONES in the face of danger. Farmer v. O/S FLUFFY D., 220 F.Supp. 917 (S.D.Tex.1963).

The foregoing negligent acts and omissions of the master of the vessel are chargeable to the shipowner, and they constitute the proximate cause of the collision resulting in the death of the pilot and damage to both the Eads Bridge and other craft in the harbor.

10. The ELAINE JONES was unseaworthy in the following respects:

(a) Her master and pilot were unfit to meet the perils reasonably to be anticipated in her voyage through St. Louis Harbor. Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724 [87 S.Ct. 1410], 18 L.Ed.2d 482 (1967). See Annotation, 18 L.Ed.2d 1497. Cf. Usner v. Luckenbach Overseas Corp. [400 U.S. 494, 91 S.Ct. 514, 27 L.Ed. 2d 562], S.Ct. Case 47, Slip Opinion dated January 25, 1971. Walker v. Harris, 335 F.2d 185 (5 Cir. 1964), cert. den. 379 U.S. 930 [85 S.Ct. 326], 13 L.Ed.2d 342 (1965).

(b) Her master and pilot were unequal in disposition and seamanship to the ordinary man in the calling under like circumstances. Boudoin v. Lykes Bros. S. S. Co., 348 U.S. 336 [75 S.Ct. 382], 99 L.Ed. 354 (1955); Keen v. Overseas Tankship Corp., 194 F.2d 515 (2d Cir. 1952), cert. den. 343 U.S. 966 [72 S.Ct. 1061], 96 L.Ed. 1363 (1952).

The unseaworthy condition of the vessel proximately contributed to the collision and the resulting losses aforesaid.

11. Mary Kathryn Griffith, as Administratrix, has standing to sue for the claims arising from the death of George Griffith in the course of his employment as a seaman by Canal, under both the Jones Act and the general maritime law. 45 U.S.C. §§ 51, 59; Lindgren v. United States, 281 U.S. 38, 50 S.Ct. 207, 74 L.Ed. 686 (1930); Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

12. The personal representative may recover for the actual pecuniary loss occasioned by the seaman's death. This is the measure of damages under F.E.L.A., 45 U.S.C., § 51, Michigan Central R. Co. v. Vreeland, 227 U.S. 59, 33 S.Ct. 192, 57 L.Ed. 417 (1913), the Jones Act, 46 U.S.C. § 688, Neal v. Saga Shipping Co., 407 F.2d 481 (5 Cir. 1969), and the Death on the High Seas Act, 46 U.S.C. §§ 761, 762, National Airlines, Inc. v. Stiles, 268 F.2d 400 (5 Cir. 1959), cert. den. 361 U.S. 88, 80 S.Ct. 157, 4

L.Ed.2d 121. Courts have consistently construed these federal statutes to exclude an award for the loss of decedent's society and companionship. Igneri v. Cie de Transports Oceaniques, 323 F.2d 257 (2 Cir. 1963), cert. den. 376 U.S. 949, 84 S.Ct. 965, 11 L.Ed.2d 969. In our view, the remedy recently provided by the Supreme Court in *Moragne* for death caused by the unseaworthiness of a vessel under the general maritime law does not adopt, or require the adoption of, any different or greater measure of damages. U. S. Steel Corp. v. Lamp, 436 F.2d 1256 (6 Cir. 1970). First, in this regard Congress has furnished the guide by enacting the foregoing statutes which are of parallel import. Secondly, the uniformity and supremacy of the maritime law dictate the need and desirability of a national rule for computing damages, especially in death cases, and thereby avoiding the diverse and often conflicting provisions of wrongful death statutes of the several states and the interpretations placed thereon by the courts. The instant case presents a classic example of confusion which would arise from any effort to supplement the general maritime law by borrowing from state law in computing damages. The first question would be which state's law to apply, that of Illinois or Missouri, depending on where the maritime tort occurred, or that of Arkansas, where the decedent resided, or that of Louisiana, where the petitioner is incorporated, or that of Mississippi, which is the forum state. Each of these jurisdictions has a wrongful death statute which provides varying elements of recovery for different classes of beneficiaries, and at least one, Missouri, has a fixed statutory ceiling. Speiser, Recovery for Wrongful Death (1969 Supp. p. 139). See Glick v. Ballentine Produce Co., 343 F.2d 839 (8 Cir. 1965), for a discussion of the differences between the Missouri and Arkansas wrongful death statutes. We do not interpret the Fifth Circuit decisions of Grigsby v. Coastal Marine Service, 412 F.2d 1011 (5 Cir. 1969), or Hornsby v. Fish Meal Co., 431 F.2d 865 (5 Cir.

1970), upon which the Administratrix relies, as requiring us to depart from the federally-established rule of damages only for pecuniary loss because of unseaworthiness of the vessel.

13. In awarding damages, the court should reasonably compensate the widow, the minor son until he becomes 21, Stark v. Chicago, North Shore & Milwaukee Ry. Co., 203 F.2d 786 (1953), and the partially dependent adult daughter, First National Bank in Greenwich v. National Airlines, 288 F.2d 621 (2 Cir. 1961); Gulf C. & S. F. R. Co. v. McGinnis, 228 U.S. 173, 33 S.Ct. 426, 57 L.Ed. 785 (1913), for the loss of contributions that they would have received for support out of the accrued and future gross earnings of the decedent had he lived. These losses, as heretofore found, equal 75% of Griffith's gross income for the balance of his work-life expectancy. In determining the extent of loss from future earnings, which is the principal element of the claim, the court should consider the decedent's actual earnings at the time of death, his work habits, and his prospects for advancement, Petition of Risdal and Anderson, Inc., 291 F.Supp. 353 (D. C.Mass.1968), and make no deduction for state and federal income taxes where the yearly estimated earnings, as here, are not clearly above the reach of the middle income scale. Cox v. Northwest Airlines, Inc., 379 F.2d 893 (7 Cir. 1967), cert. den. 389 U.S. 1044, 88 S.Ct. 788, 19 L.Ed.2d 836. Post-award losses, however, are to be discounted for present value and segregated from pre-award losses for that purpose; and under present economic conditions a discount rate of 4% is proper. Also, privation of parental nurture and guidance to a minor child is an element of pecuniary loss long recognized by the federal decisions. Michigan Central R. Co. v. Vreeland, supra; Petition of Risdal, supra. The value of parental nurture, as heretofore found, varies directly with its quality and quantity. Moore-McCormick Lines, Inc. v. Richardson, 295 F.2d 583 (2 Cir. 1961).

14. There being no evidence that the deceased pilot was aware of the set or cross-current at flood stage or in high water just above Veterans Bridge, based on his prior experience or knowledge, Griffith may not be presumed to have been personally negligent. Thus, he cannot be held contributorily negligent for the improper navigation and no diminution of damages on account of comparative negligence may be made in the death award.

15. Canal contends that the Eads Bridge was constructed in a manner that violated the Acts of Congress authorizing its erection, and because of such violation, the owners of Eads Bridge were negligent by maintaining an unreasonable obstruction to navigation which proximately contributed to the collision so that collision damages sustained by the owner and operator of Eads Bridge should be reduced one-half under the rule of The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873), and applied by the Fifth Circuit in Green v. Crow, 243 F.2d 401 (5 Cir. 1957). In rejecting this contention, we consider briefly the two enabling statutes, 14 Stat. 246, adopted July 25, 1866, and its amendatory Act, 15 Stat. 123, adopted July 20, 1868. By the original statute the bridge was to be built in accordance with the following conditions:

> "First, that the lowest part of the bridge or bottom chord shall not be less than *fifty feet above the city directrix at its greatest span*. Second, that it shall have at least one span five hundred feet in the clear, or two spans of three hundred and fifty feet in the clear of abutments. If the two latter spans be used, the one over the main steamboat channel, shall be fifty feet above the city directrix, *measured to the lowest part of the bridge at the centre of the span*. Third, no span over the water at low-water mark shall be less than two hundred feet in the clear of abutments." (Emphasis added.)

The 1868 amendatory Act provided, in pertinent part, as follows:

> "in conformity to the act of which this act is amendatory * * * and not inconsistent with the provisions of the act to which this act is amendatory: And provided further, That in constructing said bridge *there shall be one span of at least five hundred feet clear between piers.*" (Emphasis added.)

As constructed, the middle span of the Eads Bridge has 520 feet clearance between piers and may be regarded as "its greatest span" since the east and west spans have no more than 502 feet clearance between piers. At its center, the bottom chord of the middle span (as is also true with the east and west spans) is more than 50 feet above the city directrix, but this amount of clearance does not extend, as petitioner claims it should, for the entire horizontal length of the span, or from pier to pier. Petitioner's contention conflicts with familiar rules of statutory construction. The phrase in the original Act reading "* * bottom chord shall not be less than fifty feet above the city directrix at its greatest span" is ambiguous and does not clearly require 50-foot height along the entire horizontal length of the 500-foot span, although the phrase might suggest such an inference. The later sentence, however, which specifically states that a 50-foot clearance is required only at the center of each 350-foot span, clarifies the ambiguity and shows that no such stringent height requirement should be read into the earlier sentence. First of all, the separate sections or clauses of a single statute should be read by courts to harmonize with each other whenever possible. Secondly, later specific clauses should be read to qualify prior general clauses which are ambiguous. Thirdly, it would be illogical and inconsistent for Congress to require more vertical clearance under a 500-foot span than under a 350-foot span, and a court may not impute to Congress such an illogical purpose in drafting legislation if it may be avoided, as it may here. As for the amendatory Act, it adopts all requirements of the prior Act, and merely spec-

ifies that at least one span of the bridge be at least 500 feet wide, which has no effect on the ambiguity of the prior Act previously discussed. Wholly apart from construing the enabling Acts, the record shows that neither the Chief of Engineers, U. S. Army, nor any other governmental authority has ever reported or declared the Eads Bridge to be an unreasonable obstruction to navigation. 33 U.S.C. § 511 et seq. No doubt, the venerable Eads, now in its 97th year, may present a hazard to navigation, as do all bridges, but it is not an unreasonable obstruction to navigation and remains a lawful structure, and its owner and operator are entitled to rely upon boats passing through it carefully and avoiding contact with and damage to the structure. Seaboard Airline R. Co. v. Pan American Petroleum & Transport, supra; Texas & P. Ry. Co. v. Angola Transfer Co., 18 F.2d 18 (5 Cir. 1927).

■■■■ 16. The Bridge Company and Terminal are entitled to recover the full cost of the repairs to the Eads Bridge without reduction for depreciation since the repairs have not resulted in any enhancement of the value of the structure nor extended its useful life. Browning Steamship Co., Inc., v. F. H. Peavey & Co., 235 F.2d 5 (8 Cir. 1956); Shepard S. S. Co. v. United States, 111 F.2d 110 (2 Cir. 1940); Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890 (1925). Terminal is also entitled to recoup its established losses in revenues and increased expenses sustained during the time that the Eads Bridge was under repair. City of Miami v. Western Shipping & Trading Co., 232 F.2d 847, (5

Cir. 1956); The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937 (1897). The loss of such profits and increases in expenses may be proved circumstantially, and the court may consider as a relevant, corroborating circumstance earnings for comparable periods before the damage was sustained. Aktieselskapet Bonheur v. San Francisco & P. S. S. Co., 287 F. 679 (9 Cir. 1923); South Carolina State Highway Dept. v. United States, 78 F. Supp. 598 (E.D.S.C.1948); Oil Screw Noah's Ark v. Bentley & Felton Corp., 322 F.2d 3 (5 Cir. 1963). Terminal may also recover necessary and reasonable expenses for providing substitute passage and transfer of its customer trains. State Road Dept. v. United States, 78 F. Supp. 278 (N.D.Fla.1948); City and County of San Francisco v. United States, 82 F.Supp. 313 (N.D.Cal.1948). Terminal discharged its legal duty to mitigate losses as much as was practicably possible under the circumstances.

■■ ■■ 17. The general rule in admiralty is that those injured by tortious collision are entitled to interest as part of just compensation for wrong done, and discretion to deny interest is based upon existence of peculiar circumstances. Sinclair Refining Co. v. S. S. Green Island, 426 F.2d 260 (5 Cir. 1970). Accordingly, the court, in the exercise of its discretion, allows interest from June 15, 1970, upon the claim of the Bridge Company and Terminal, and from November 1, 1969, upon the minor property damage claims.

Let Judgment be entered accordingly.

See Appendix on next page.

## APPENDIX A